Maximilian Morrof [1] v. Commissioner. Morrof v. Comm'r
Docket Nos. 2906-62, 2905-62.
United States Tax Court
T.C. Memo 1967-201; 1967 Tax Ct. Memo LEXIS 62; 26 T.C.M. (CCH) 985; T.C.M. (RIA) 67201; October 13, 1967
Maximilian Morrof, pro se, 496 Ridgewood Ave., Glen Ridge, N.J., in Docket No. 2906-62. Jack N. Honart, for the petitioner Ida Morrof in Docket No. 2905-62. Leo A. Burgoyne and Donald H. Cuozzo, for the respondent. DAWSON
*62 Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined that petitioners Maximilian Morrof and Ida Morrof are individually liable for the following deficiencies in income tax and additions to tax: *63 MAXIMILIAN MORROF, DOCKET NO. 2906-62
Additions to Tax
I.R.C. 1939
I.R.C. 1954
Sec. 294(d)
Year
Deficiency
Sec. 291(a)
Sec. 293(b)
(1)(A)
Sec.
Sec.
6653(b)
6654(a)
1949
$ 5,516.49
$1,379.12
$2,758.24
$497.48
1950
5,095.01
1,273.75
2,542.50
458.27
1951
10,059.51
2,514.87
5,029.75
905.36
1952
5,020.68
1,255.17
2,510.34
451.87
1953
6,077.80
1,519.45
3,038.90
547.02
1954
4,019.87
732.38
$3,958.87
1955
363.37
1,082.30
$ 60.61
1956
11,397.82
9,237.79
513.79
*64 IDA MORROF, DOCKET NO. 2905-62
Additions to Tax
I.R.C. 1939
I.R.C. 1954
Sec. 294(d)
Year
Deficiency
Sec. 291(a)
Sec. 293(b)
(1)(A)
Sec.
Sec.
6653(b)
6654(a)
1949
$ 2,018.06
$ 504.51
$1,009.03
$181.62
1950
none
none
none
none
1951
1,614.68
403.67
807.34
145.33
1952
52.14
13.04
26.07
4.68
1953
192.06
48.01
96.03
17.28
1954
2,018.68
186.73
$1,009.34
1955
2,826.33
1,413.17
$ 79.14
1956
4,038.34
2,019.17
113.07
Pursuant to an oral stipulation made on the record by the parties hereto on November 2, 1966, it was agreed that (1) the taxable income of Maximilian Morrof for the years 1954, 1955, and 1956 was $14,000, $12,200, and $26,400, respectively; (2) that Ida Morrof had no taxable income for the years 1954, 1955, and 1956 and that there are no deficiencies or additions to tax due from Ida Morrof for such years; (3) that any income for the years 1949 through 1953 determined by respondent, and sustained by this Court, to be the income of Ida Morrof shall be treated as the income of, and taxable to, Maximilian Morrof for such years; and (4) that there are *65 no deficiencies or additions to tax due from Ida Morrof for the years 1949 through 1953. In view of these stipulations, a decision reflecting no deficiencies and no additions to tax will be entered for petitioner Ida Morrof in Docket No. 2905-62. Respondent's motion for an increased deficiency for the year 1955 against Maximilian Morrof was granted by the Court. On December 8, 1964, pursuant to the provisions of Rule 31(b)(5) of the Court's Rules of Practice, respondent filed a motion for an order to show cause why certain facts and documents should not be accepted as established in the case of Maximilian Morrof, Docket No. 2906-62. The Court entered an Order to Show Cause on December 9, 1964. Petitioner filed a general, one paragraph response thereto on January 1, 1965. A hearing was held on March 15, 1965, with respect to the Order to Show Cause and an Order was entered by the Court on March 30, 1965, which reads, in part, as follows: ORDERED: That the Order to Show Cause is hereby made absolute and the facts and evidence set forth in Exhibit A to the respondent's motion filed on December 8, 1964, subject to the changes specified in the transcript of the proceedings on March 15, 1965, are *66 hereby accepted as established for the purposes of this case. This case was tried on the following dates: June 13, 14, and 15, 1966 September 6, 7, and 8, 1966 October 26, 27, and 28, 1966 November 1 and 2, 1966 April 10, 1967 On 10 different occasions petitioner Maximilian Morrof moved for and was granted continuances for various reasons. [2]
The issues for decision are: 1. Whether the petitioner Maximilian Morrof is liable *67 for income tax deficiencies for the years 1949 through 1956. 2. Whether any part of the income tax deficiencies determined by the respondent for the years 1949 through 1953 and any part of the underpayments of tax required to be shown on petitioner's income tax returns for the years 1954 through 1956 are due to fraud with intent to evade tax. 3. Whether the petitioner Maximilian Morrof is liable for the additions to tax under sections 291(a) and 294(d)(1)(A) of the Internal Revenue Code of 1939 and section 6654(a) of the Internal Revenue Code of 1954. Findings of Facts All stipulated facts, as well as facts declared established by our Order of March 30, 1965, under Rule 31(b)(5) of the Court's Rules of Practice, are incorporated herein by this reference. Maximilian Morrof (herein called petitioner) was a legal resident of Glen Ridge, New Jersey, at the time his petition was filed in this proceeding (Docket No. 2906-62). His home address was then and still is 496 Ridgewood Avenue. Petitioner filed no Federal income tax returns for the years 1949 through 1953. He filed on January 7, 1959, untimely Federal income tax returns for the years 1954, 1955, *68 and 1956 with the district director of internal revenue at Newark, New Jersey. During the years 1949 through 1956 the petitioner engaged in the practice of law at 26 Journal Square, Jersey City, New Jersey. On May 3, 1956, the petitioner appeared at the office of the district director of internal revenue, Newark, New Jersey, before special agents Fred E. Krysa and Alexander Kuszynski and informed them that he wanted to "confess" and make a "clean breast" of his tax irregularities. On such occasion the petitioner acknowledged to the agents that: 1. He had testified before the New Jersey Superior Court, Chancery Division, in January or February 1956, that he had filed Federal income tax returns for the years 1949 to 1955, inclusive, when actually he had not. 2. He kept careful records consisting of a file for each client which contained a copy of the check he received for the fee together with diaries maintained at his office for the years 1952 through 1954 and that he had all of his bank statements and cancelled checks for the years involved. 3. He had the following bank accounts: A. Trust Account at the First National Bank, 880 Bergen Avenue, Jersey City, New Jersey; *69 B. Checking Account at Bergen Trust Company, 26 Journal Square, Jersey City, New Jersey; C. Bank Account at Trust Company of New Jersey, Journal Square, Jersey City, New Jersey; D. Bank Account at Hudson County National Bank, 4 Journal Square, Jersey City, New Jersey; E. Bank Accounts in the name of his wife, Ida Morrof, at the Glen Ridge Trust Company, Ridgewood Avenue, Glen Ridge, New Jersey, and the Glen Ridge Savings and Loan Association, Ridgewood Avenue, Glen Ridge, New Jersey. 4. He held United States Government Series E Bonds in his wife's name. 5. He had brokerage accounts with the following firms: A. Merrill Lynch, Pierce, Fenner and Beane at their Newark and New York Offices in the name of Ida Morrof; B. Lehman Brothers, 1 William Street, New York City, New York; C. Outwater and Wells, Exchange Place, Jersey City, New Jersey. 6. He had no cash on hand except cash his wife had at home which was never in excess of $125 and that he and his wife never had any accumulation of cash in any depository whatsoever. In October 1956, William Nagle, a special agent of the Intelligence Division, Internal Revenue Service, Newark, New Jersey, was assigned to investigate *70 the case of petitioner and his wife, Ida Morrof. After Nagle received his assignment, he held a conference with attorney David Zuckerman, who, along with Herbert L. Zuckerman, [3] had powers of attorney to represent petitioner, concerning income the petitioner might have had from his law practice and from other sources for the years 1949 through 1955. Subsequently, Nagle requested Zuckerman to furnish the 1956 records of petitioner. Zuckerman also furnished Nagle and Fost, an internal revenue agent also assigned to the case, copies of monthly bank statements, copies of bank deposit tickets, cancelled checks, check stub books, and petitioner's diaries. No regular books of account of petitioner were ever furnished Nagle during the course of his investigation. Nagle, at the conference with Zuckerman, requested that Zuckerman supply the names and addresses of petitioner's clients, but such information was never furnished. Municipal, County, and State *71 court records were examined in an attempt to ascertain petitioner's clients, but in most instances the courts' indexes were tied into cases and not into the attorney's name, thus Nagle was not able to identify clients of petitioner from the court records. A further search was made of the immigration and naturalization records in New York and one or two clients of petitioner became known. Brokerage accounts and bank records were examined and, in instances where the names of clients were obtained, they were contacted. However, in the absence of records being made available to Nagle showing the names and addresses of petitioner's clients and the inability of Nagle to ascertain clients from third-party sources, Nagle was unable to determine the taxable income of petitioner by identifying specific fees and clients. In the absence of adequate and complete books and records, respondent computed petitioner's taxable income for the years 1949 through 1956 substantially by the bank deposit method in each year plus: (a) cash cost of living expenditures in each of the years 1949 and 1950 of $7,800; (b) a $16,000 cash expenditure made by petitioner in 1956 to purchase stock; and (c) fees reflected *72 in petitioner's diary which could not be traced into bank deposits. In his computation of petitioner's bank deposits, respondent determined that petitioner made the following deposits during the years indicated: (a) Maximilian Morrof, Trust Account at the First National Bank of Jersey City for the years 1949 through 1956: Total Amount
Year
of Deposits
1949
$ 1,058.45
1950
4,912.73
1951
$ 1,600.00
1952
47,358.02
1953
12,494.00
1954
58,061.85
1955
23,082.61
1956
47,353.59 Although this account was labeled as a trust account, petitioner comingled and made personal withdrawals from such trust account for mortgage payments on his residence, family medical expenses, life insurance payments, personal loans, fuel home consumption, charities, gifts to his father, telephone bills, air conditioner purchase, automobile repairs, purchase of stock, watch repairs, plumbing, and motel accommodations. (b) Bergen County Trust Company: Total Amount
Year
of Deposits
1949
$ 4,365.95
1950
9,136.75
1951
38,823.54
1952
3,732.38
(c) Hudson County National Bank: Total Amount
Year
of Deposits
1952
$12,740.72
1953
11,261.30
1954
2,362.00
*73 (d) Savings Accounts at the Glen Ridge Savings and Loan Association, Glen Ridge, New Jersey, in the name of his wife, Ida F. Morrof: Total Amount
Year
Account Number
of Deposits
XXXX
XXXX
XXXX
XXXX
1949
$5,000.00
$ 249.77
$ 5,249.77
1950
340.00
18.30
358.30
1951
5,950.00
41.81
$ 51.75
6,043.56
1952
1,780.00
92.85
13.00
1,885.85
1953
1,300.00
5,181.56
6,481.56
1954
1,500.00
2,050.00
1,000.00
$1,198.38
5,748.38
1955
3,800.00
4,288.04
3,167.21
12,162.79
1956
4,199.88
450.00
4,649.88
(e) Savings Account at the Nutley Savings and Loan Association, Nutley, New Jersey, in the name of his wife, Ida F. Morrof: Total Amount
Year
of Deposits
1949
$ 2,900.00
1950
1,300.00
(f) Savings Account at the DeWitt Savings and Loan Association under the name of his wife, Ida F. Morrof: Total Amount
Year
of Deposits
1949
$ 2,500.00
1950
800.00
Nagle prepared summaries reflecting the details of his analyses of the bank deposits in determining the taxable income of petitioner. These schedules were prepared from copies of monthly bank statements *74 and duplicate copies of deposit tickets furnished by Zuckerman, the petitioner's representative, and also from the inspection of the original deposit tickets at the banks. The analyses characterized the deposits as either cash or check. In instances where the deposit could not be identified, it was listed under the cash column. Nagle was able to determine whether the deposit was in cash or check from the examination of the duplicate deposit tickets furnished by Zuckerman as supplemented by an examination of the bank deposit tickets. The various analyses listed the total amount of deposits to petitioner's checking account at the Hudson County National Bank for the years 1950 through 1954, the First National Bank of Jersey City for the years 1949 through 1956, and the Bergen County Trust Company for the years 1949 through 1952. In the course of his investigation, Nagle analyzed the withdrawals from the checking accounts of petitioner at the Hudson County National Bank, the First National Bank of Jersey City, and the Bergen County Trust Company. Detailed schedules were prepared from cancelled checks and check stub books furnished by Zuckerman during the course of the investigation. *75 The schedules show the date of the check, the payee of the check, the amount of the check, the check number, and a breakdown of the analysis of the withdrawals as to personal, business, or exchanges. The analyses of petitioner's withdrawals show the following total withdrawals and the amounts of such withdrawals allowed petitioner as business expenses: (a) Hudson County National Bank: Amount Allowed
as Business
Total Amount
Year
Expenses
of Withdrawals
1952
$2,387.38
$12,739.05
1953
5,404.46
11,255.81
1954
1,502.92
2,192.61
(b) First National Bank of Jersey City: Amount Allowed
as Business
Total Amount
Year
Expenses
of Withdrawals
1952
$ 170.00
$43,018.88
1953
1,621.67
16,504.73
1954
6,340.84
48,373.80
1955
6,239.43
31,469.07
1956
4,143.54
47,234.97
(c) Bergen Trust Company: Amount Allowed as
Total Amount of
Exchange and
Year
Business Expenses
Withdrawals
Escrow Funds
1951
$1,480.13
$38,718.07
$27,162.85
1952
2,261.49
3,843.22
In his notice of deficiency the respondent allowed petitioner business expenses of $3,225.03 and $3,300.00 for the taxable years 1949 *76 and 1950, respectively. Petitioner had further allowable business expenses, in addition to the other business expenses allowed, in the amount of $1,100 for each of the taxable years 1949 through 1953, representing the following items or categories: salary, automobile expenses, office supplies and postage, book supplements, travel and entertainment, and general office expenses. In the course of his investigation, Nagle further analyzed withdrawals from petitioner's checking accounts and savings accounts maintained in his wife's name, and made the following eliminations therefrom to arrive at net bank deposits: (a) Exchanges
Year
Amount
1. Hudson County National Bank
1951
$ 5,885.00
2. First National Bank of Jersey City
1951
1,600.00
1952
28,397.88
1953
9,174.89
1954
28,311.98
1955
12,026.00
1956
30,266.83
3. Bergen Trust Company
1951
25,746.80
4. Other (per notice of deficiency)
1949
1,120.79
(b) Transfers
1. From Checking Accounts to Savings Accounts
1951
2,700.00
1952
600.00
1954
5,550.68
1956
160.00
2. From Savings Accounts to Checking Accounts
1949
975.00
1950
696.85
1952
1,190.00
1953
2,300.00
1954
470.00
1955
4,050.00
1956
385.00
3. Between Savings Accounts
1949
16.77
1950
18.30
1951
93.56
1952
92.85
1953
22.87
(c) Various Proceeds
1. Sale of Government Series E Bonds
1953
$ 5,118.00
1955
1,288.04
2. Sale of Stock
A. Outwater-Wells
1955
9,000.00
B. Lehman Brothers
1956
4,039.88
(d) Bank Dividends
1952
13.00
1953
40.69
1954
197.70
1955
167.21
(e) Cash on hand from sale of stock
1956
6,166.21
(f) Escrow funds (First National Bank of New Jersey)
1952
17,000.00
1954
15,679.07
*77 After computing gross bank deposits and all eliminations from gross bank deposits to arrive at net bank deposits, Nagle computed petitioner's gross receipts by adding to net bank deposits, as follows: Year
Amount
(a) Fees per diary not deposited
1951
$ 7,883.59
1952
6,215.02
1953
8,838.23
1954
8,259.45
1955
4,489.75
1956
15,491.20
(b) Interest
1. Savings Accounts
1949
112.81
1950
76.81
1951
50.52
1952
104.11
1953
51.39
1954
75.75
1955
69.12
1956
53.47
2. Government Bonds
1953
1,193.00
1955
331.79
(c) Cash purchase of stock
1956
16,330.78
(d) Dividends on stock
1954
271.08
1955
1,059.21
1956
695.73
(e) Long-term capital gain
1. Sale of stock
1954
3,805.58
1955
6,790.54
1956
2,103.47
(f) Cash living costs: Per notice of deficiency
1949
7,800.00
1950
7,800.00
Petitioner recorded the following legal fees in his diaries for the taxable years 1951 through 1956: Total Legal Fees
Year
Per Diary
1951
$13,528.32
1952
10,064.44
1953
13,024.96
1954
42,402.68
1955
8,283.06
1956
30,147.56 Of said total fees, the following amounts were not deposited *78 in banks: Year
Amount
1951
$ 7,883.59
1952
6,215.02
1953
8,838.23
1954
8,259.45
1955
4,489.75
1956
15,491.20
Petitioner received savings account interest as follows: Year
Amount
1949
$112.81
1950
76.59
1951
50.52
1952
104.11
1953
51.39
1954
75.75
1955
69.12
1956
53.47
On February 17, 1953, petitioner deposited $5,118 to the savings account, No. XXXX, at the Glen Ridge Savings and Loan Asoociation. This deposit was made by the redemption of United States Savings Bonds registered in the name of Ida Frank Morrof, payable on death to Sandra Barbara Morrof, petitioner's daughter. Said bonds were purchased at a total cost of $3,925 and had accrued interest on February 17, 1953, of $1,193. On March 10, 1955, petitioner deposited $1,288.04 in savings account, No. XXXX, at the Glen Ridge Savings and Loan Association. This deposit was made by the redemption of United States Savings Bonds registered in the name of Ida Frank Morrof, payable on death to Sandra Barbara Morrof. Said bonds were purchased at a total cost of $956.25 and had accrued interest on March 10, 1955, of $331.79. Petitioner purchased the following stocks during *79 the period from August 3, 1956, through October 12, 1956: Total Cost In-
No. of
cluding Com-
Date
Shares
Corporation
mission
Date Paid
8- 3-56
100
Ogden Corporation
$ 2,082.16
8-17-56
8- 6-56
100
General Transistor
500.00
8-23-56
8- 7-56
100
General Transistor
500.00
8-23-56
8- 8-56
200
Lamston
1,750.00
8-25-56
8-13-56
100
Bowser (preferred)
1,570.50
12-11-56
8-22-56
300
General Dynamics
2,342.09
12-11-56
8-24-56
200
2nd Nat'l Bank of Red Bank
931.50
12-11-56
8-30-56
400
Lamston
3,450.00
12-11-56
10- 4-56
100
General Contracting
1,494.75
12-11-56
10-12-56
100
Shulton
1,709.38
12-11-56
TOTAL
$16,330.38
On December 11, 1956, petitioner made a payment of $11,501.22 in cash to a securities dealer in the following denominations: $9,000 in $100 dollar bills, $2,500 in $50 dollar bills, and a 1 dollar bill. The securities dealer filed a currency transaction return with the Federal Reserve Bank in accordance with the rules and regulations in spite of petitioner's desire, expressly made known to the dealer, that the currency transaction be suppressed. During the years 1954, 1955, and 1956, *80 petitioner received dividend checks from the following listed corporations and all such checks were cashed with the exception of those amounts indicated as deposited: Not De-
Corporation
Year
Amount
Deposited
posited
Commercial Trust Co., of New Jersey
1954
$ 30.00
$ 7.50
$ 22.50
1955
35.00
12.50
22.50
1956
35.00
Sun Life Assurance Co., of Canada
1954
99.43
21.67
77.76
1955
80.31
36.97
43.34
Colonial Life Insurance Co., of America
1954
67.65
10.05
57.60
1955
13.00
13.00
Manhattan Company
1954
13.60
3.40
10.20
1955
5.70
3.80
1.90
Chase Manhattan Bank
1955
20.00
20.00
1956
20.25
20.25
Irving Trust Company
1954
10.40
2.40
8.00
1955
10.40
3.20
7.20
1956
13.60
13.60
Hackensack Water Co.
1954
50.00
50.00
1955
226.00
56.50
169.50
1956
116.00
116.00
First Nat'l Bank of Jersey City
1954
50.00
50.00
1955
229.50
229.50
1956
11.25
11.25
Pan Handle Eastern Pipe Line Company
1955
106.25
106.25
Granite City Steel
1955
165.00
165.00
1956
112.50
112.50
Benefit Standard Life Insurance Company
1955
120.00
120.00
1956
120.00
120.00
Lincoln National Life Insurance Company
1955
10.00
10.00
1956
19.00
19.00
Mesta Machine Co.
1955
62.50
62.50
1956
221.88
221.88
Trust Company of New Jersey
1955
12.50
12.50
1956
20.00
20.00
American Title and Insurance Company
1955
18.75
18.75
1956
56.25
56.25
*81 On January 26, 1939, petitioner acquired in the name of his wife, Ida F. Morrof, as registered owner, 10 shares of stock of the Colonial Life Insurance Company, $100 par value. On August 25, 1939, petitioner acquired another 5 shares of said stock. On April 18, 1952, Colonial Life Insurance Company declared a stock dividend of 10 shares for each share owned and petitioner was issued, at no cost to him, 150 shares of such stock. On August 11, 1954, Merrill Lynch, Pierce, Fenner, and Beane sold 100 shares of such stock at a price of $9,101.25 and credited petitioner's account in that amount. Said stock was acquired by petitioner in 1939 at a cost or other basis for computing a gain or loss of $14.90 per share and an aggregate basis of $1,490. Petitioner realized a profit from this sale of $7,611.25. The amount of $9,101.25 was disbursed by the brokers in behalf of petitioner as follows: Date
Debit
Credit
8-11-54
Sold 100 shares Colonial Life Insurance Company
$9,101.25
8-11-54
Purchase - 100 shares Hackensack Water Company
$4,613.03
8-16-54
Check
289.91
8-17-54
Purchase - 100 shares First National Bank of
4,198.31
Jersey City
$9,101.25
$9,101.25
*82 On September 21, 1955, petitioner sold 17 shares of Colonial Life Insurance Company stock through his broker, Merrill Lynch, Pierce, Fenner and Beane for $2,515.20 and said broker credited his account for that amount. Said stock was acquired by petitioner in 1939 and at a cost or other basis for computing gain or loss of $14.90 per share or an aggregate basis of $253.30. Petitioner realized a profit on the sale of $2,261.90. On February 18, 1953, Merrill Lynch, Pierce, Fenner and Beane purchased for the account of Ida F. Morrof 30 shares of stock in Sun Life Assurance Company of Canada at a net cost of $5,115. On July 5, 1955, these same shares were sold by Merrill Lynch for petitioner for $9,118.62 resulting in a profit to petitioner of $4,003.62. Petitioner, through the brokerage firm of Outwater and Wells purchased stock in 1954 and sold stock in 1955 as follows: Date of Pur-
Date of
Net Sales
Profit to Pe-
Description of Stock
chase
Net Cost
Sale
Price
titioner
200 shares - Trust
12- 6-54
$1,525.00
6-23-55
$2,599.75
$1,074.75
Co. of New Jersey
500 shares - Trust
12-23-54
4,125.00
6-23-55
6,499.35
2,374.35
Co. of New Jersey
TOTALS
$5,650.00
$9,099.10
$3,449.10
*83 On January 12, 1955, petitioner sold 50 shares of stock of Colonial Life Insurance Company of America through the brokerage firm of Merrill Lynch for a net price of $4,611.45. This stock was acquired by petitioner in 1939 and at a cost or other basis for computing gain or loss of $14.90 per share or an aggregate basis of $745. Petitioner realized a profit from the same of $3,866.45. During the taxable year 1956 the petitioner sold stock through brokers, as follows: No. of
Net Purchase
Net Sales
Profit or (Loss)
Shares
Description of Stock
Price
Price
to Petitioner
(a)
100
Beneficial Life Ins. Co.
$2,628.00
$2,969.94
$ 341.94
(b)
100
Beneficial Life Ins. Co.
2,500.00
2,969.94
469.94
(c)
100
First Nat'l Bank of Jersey
4,198.31
5,273.50
1,075.19
City
(d)
100
Trust Company of New
700.00
1,399.85
699.85
Jersey
(e)
20
Lincoln Nat'l Life Ins.
4,830.00
4,799.86
(30.14)
Co.
(f)
50
Granite City Steel Co.
1,634.35
2,123.78
489.43
(g)
50
Mesta Machine Co.
2,268.75
2,969.76
701.01
(h)
25
Panhandle Eastern Pipe
1,879.82
2,049.07
169.25
Line Co.
(i)
25
Granite City Steel Company
817.18
1,146.60
329.42
(j)
25
Mesta Machine Company
1,134.38
1,524.15
389.77
(k)
75
Hackensack Water Company
3,459.78
3,368.90
(90.88)
(l)
50
Carpenter Steel Company
2,563.37
2,907.57
344.20
(m)
50
American Tractor Corp.
709.05
726.83
17.78
TOTAL
$4,906.76
*84 Purchasing Broker
Date of
Selling Broker
Date of
Purchase
Sale
(a)
Goodbody & Company
3-29-55
Lehman Brothers
5-17-56
(b)
Lehman Brothers
3-29-55
Lehman Brothers
5-18-56
(c)
Merrill Lynch
8-17-54
Outwater and Wells
2-29-56
(d)
Subscription from
1-25-55 and
corporation
8- 2-55
Outwater and Wells
2-29-56
(e)
Merrill Lynch
7-11-55
Sloan, Rodetsky Co.
7-24-56
(f)
Merrill Lynch
7-11-55
Hayden, Stone & Co.
5-15-56
(g)
Merrill Lynch
7- 7-55
Hayden, Stone & Co.
5-15-56
(h)
Merrill Lynch
1-13-55
Hayden, Stone & Co.
5-15-56
(i)
Merrill Lynch
7-11-55
Hayden, Stone & Co.
8- 6-56
(j)
Merrill Lunch
7- 7-55
Hayden, Stone & Co.
8- 6-56
(k)
Merrill Lynch
8-11-54
Hayden, Stone & Co.
8- 7-56
(l)
Hayden, Stone & Co.
7-19-56
Hayden, Stone & Co.
8- 8-56
(m)
Hayden, Stone & Co.
8- 6-56
Hayden, Stone & Co.
8- 8-56
At an interview held on March 18, 1958, between petitioner and respondent's agents, petitioner stated that he had never had a power of attorney to represent clients before the Internal Revenue Service, and, further, that to the best of his recollection he had never subscribed to a Federal *85 tax service. One of respondent's agents then informed petitioner that, during the course of the investigation, the Internal Revenue Service had obtained a copy of a contract dated in August 1952 which was obtained from the Research Institute Tax Coordinating Program involving four volumes and an additional one volume of a lawyer's tax handbook which cost approximately $432. Petitioner then recalled that he had subscribed to the service and that he had not paid the bill in full. Petitioner did have a client involved in a tax dispute with the Internal Revenue Service involving reconstruction of income and fraud penalties. In representing his client the petitioner met with the agent assigned to the case. The first meeting was held in petitioner's office and was for the purpose of trying to eliminate any items which may have been wash items and not taxable items. Petitioner and the agent had one conference in New York on July 8, 1952, and three conferences at petitioner's office in Jersey City, on August 13, 20, and October 6, 1952, all relating to the examination of his client's tax returns for the years 1944 and 1945. The special agent submitted a written report of his investigation *86 of petitioner's tax returns on July 28, 1958. Subsequent thereto, on January 7, 1959, petitioner filed Federal income tax returns for the years 1954, 1955, and 1956. On January 2, 1962, before the expiration of the time prescribed in section 6501(a), Internal Revenue Code of 1954, for assessment of additional income taxes against petitioner for the years 1954, 1955, and 1956, the petitioner and respondent agreed in writing, pursuant to section 6501(c)(4), to extend to June 30, 1963, the time within which respondent might assess additional income taxes against petitioner for such years. Respondent's notice of deficiency was mailed to petitioner on April 20, 1962. On December 30, 1960, upon a plea of nolo contendere, petitioner was sentenced by the United States District Court for the District of New Jersey to 6 months imprisonment on each of 3 counts of the offense of "failure to make income tax returns" for the years 1954, 1955, and 1956, the sentences to run concurrently for a total imprisonment of 6 months. Petitioner had taxable income for the years 1954, 1955, and 1956, as follows: Year
Taxable Income
1954
$14,000.00
1955
12,200.00
1956
26,400.00
*87 The total deposits made by petitioner in his bank accounts in each of the years 1949 through 1953 were as follows: Year
Amount
1949
$16,074.17
1950
15,207.88
1951
47,767.10
1952
65,716.97
1953
30,236.86
The following amounts included in the total deposits in his bank accounts during the years 1949 through 1953 represent escrow moneys, exchanges, transfers between accounts, proceeds from the sale of assets, and income from sources other than petitioner's law practice and do not represent income from petitioner's law practice: Year
Amount
1949
$ 2,112.56
1950
3,578.56
1951
30,140.36
1952
53,178.73
1953
16,656.45
Petitioner had the following business expense deductions in his law practice during the years 1949 through 1953: Year
Amount
1949
$4,325.03
1950
4,400.00
1951
2,580.13
1952
5,918.87
1953
8,126.13
Petitioner had itemized deductions in each of the years 1949 through 1953 as follows: Year
Itemized Deductions
1949
$1,443.96
1950
1,237.29
1951
1,263.90
1952
1,227.73
1953
1,259.16
Petitioner was entitled to three exemptions in each of the years 1949 through 1953. *88 Petitioner's taxable income by reconstruction under the bank deposits method plus cash cost of living expenses in each of the years 1949 and 1950 of $7,800 and specific items of income not traceable to bank deposits in each of the years 1949 through 1953 is as follows: Year
Taxable Income
1949
$14,305.43
1950
12,068.52
1951
19,916.82
1952
9,910.77
1953
12,477.74
Ultimate Findings 1. A part of the income tax deficiencies for each of the years 1949 through 1953 was due to fraud with intent to evade tax. 2. A part of the underpayment of tax required to be shown on petitioner's income tax returns in each of the years 1954, 1955, and 1956 was due to fraud with intent to evade tax. 3. Petitioner is liable for an addition to tax under section 291(a), Internal Revenue Code of 1939, for each of the years 1949 through 1953 for failure to make and file an income tax return. 4. Petitioner is liable for an addition to tax under section 294(d)(1)(A), Internal Revenue Code of 1939, for each of the years 1949 through 1954 and under section 6654(a), Internal Revenue Code of 1954, for the years 1955 and 1956 for failure to file a declaration *89 of estimated tax and pay same. Opinion Petitioner filed no income tax returns for the years 1949 through 1953 and filed untimely and incorrect returns for the years 1954 through 1956. He did not keep adequate books and records from which his taxable income for those years could be determined. [4] In the absence of adequate books and records, an examination conducted by respondent's agents disclosed that petitioner had various potential sources of income and that he made substantial bank deposits during the years in question. The deficiency determinations were based upon the computation of taxable income for the years 1949 through 1956 substantially by the bank deposit method in each year plus (1) cash cost of living expenditures in each of the years 1949 and 1950 of $7,800, (2) a $16,000 cash expenditure by petitioner in 1956 to purchase stock, and (3) legal fees shown in petitioner's diary which could not be traced into bank deposits. It is our view that respondent was justified in determining petitioner's taxable income by using the bank deposit method. Where a taxpayer has made numerous deposits in bank accounts, the sources or nature of which are not accounted for or recorded *90 in books and records maintained by him, determinations made by the Commissioner of income subject to tax on the basis of such deposits have been approved in many instances; and it has been repeatedly held that a presumption of correctness attaches to such determinations and that the taxpayer has the burden of overcoming this presumption. See section 446(b), Internal Revenue Code of 1954; Estate of Robert Lyons Hague, 45 B.T.A. 104, 109, affd. 132 F. 2d 775, 776 (C.A. 2, 1943), certiorari denied 318 U.S. 787; Thomas B. Jones, 29 T.C. 601, 613-614 (1957); Hoefle v. Commissioner, 114 F. 2d 713, 714 (C.A. 6, 1940); Boyett v. Commissioner, 204 F. 2d 205, 208 (C.A. 5, 1953); Goe v. Commissioner, 198 F. 2d 851, 853 (C.A. 3, 1952); Doll v. Glenn, 231 F. 2d 186, 188 (C.A. 6, 1956); O'Dwyer v. Commissioner, 266 F. 2d 575, 588 (C.A. 4, 1959), affirming 28 T.C. 698, certiorari denied 361 U.S. 862. *91 In determining the amount of petitioner's taxable income on the basis of unexplained bank deposits, respondent eliminated therefrom all deposits the source or nature of which he was able to identify. In addition, the unexplained deposits for some of the years were also reduced by concessions made by respondent in the course of the trial. An attempt was made at the trial to elicit from petitioner an explanation of the source or nature of the remaining deposits, but his testimony was, for the most part, general and unsatisfying. Since the petitioner failed to file income tax returns for 5 years and filed untimely returns for the other 3 years, this is a case in which it is peculiarly appropriate to place the burden upon petitioner to show that his unexplained deposits did not in fact represent taxable income. Yet his testimony was vague, confusing, unconvincing, and not worthy of belief. Certainly it does not support his sweeping assertions that the deposits did not reflect taxable income which was otherwise unaccounted for. Respondent must establish the requisite fraud by clear and convincing evidence to support the 50-percent additions to tax under section 293(b) of the 1939 Code *92 and section 6653(b) of the 1954 Code. Arlette Coat Co., 14 T.C. 751 (1950); Luerana Pigman, 31 T.C. 356, 370 (1958). We think he has successfully carried that burden of proof. Respondent is not required to prove that the entire amount determined by him to have been received by the petitioner was tainted by fraud. The statute and the decided cases establish that if a part of the deficiency or underpayment is due to fraud the addition to tax attaches to the entire deficiency. Arlette Coat Co., supra. The fraud mentioned in the 1939 and 1954 Code provisions is "actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing." Mitchell v. Commissioner, 118 F. 2d 308, 310 (C.A. 5, 1941); Tomlinson v. Lefkowitz, 334 F. 2d 262, 265 (C.A. 5, 1964), certiorari denied 379 U.S. 962 (1965). And it is now well established that in a tax fraud case "consistent failure to report substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent." Schwarzkopf v. Commissioner, 246 F. 2d 731, 734 (C.A. 3, 1957), *93 affirming a Memorandum Opinion of this Court; Holland v. United States, 348 U.S. 121 (1954); and Kurnick v. Commissioner, 232 F. 2d 678 (C.A. 6, 1956). If the repetitive pattern of substantial omissions of income by a man of petitioner's intelligence, education, and profession were the only factors involved, we would feel justified in finding a fraudulent intent in this case. But there are other "badges of fraud." We know that petitioner, on a plea of nolo contendere, was sentenced to 6-months imprisonment for willful failure to file income tax returns for the years 1954, 1955, and 1956. The circumstances attending petitioner's failure to file returns support an inference of intention to evade taxes. See Cirillo v. Commissioner, 314 F. 2d 478 (C.A. 3, 1963). Here there is not only proof of specific omissions of income but also inadequate records, misrepresentations to respondent's agents, the purchase of stock and maintenance of bank accounts in the name of petitioner's wife, and an attempt to suppress the reporting of a currency transaction by a securities dealer to the Federal Reserve Bank which the dealer was required to report. On this record *94 our ultimate findings of fact are dispositive of the fraud issue. The respondent's determination of the amount of petitioner's income and the existence of deficiencies are prima facie correct. Even in a fraud case, where the burden of proving fraud is on the Commissioner, the taxpayer still retains the burden of proving error in the determination of the amount of deficiency. Jacob D. Farber, 43 T.C. 407, 428 (1965); Max Cohen, 9 T.C. 1156 (1947), affd. 176 F. 2d 394 (C.A. 10, 1949). We sustain the deficiencies in income tax, as modified, in view of petitioner's failure to introduce competent evidence to rebut the presumption of correctness of such determination. Cf. Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court. Petitioner has offered no evidence to show why he failed to file income tax returns for the years 1949 through 1953. Accordingly, we hold that petitioner is liable for the additions to tax imposed by section 291(a) of the 1939 Code for the years 1949 through 1953. Likewise, the petitioner has failed to establish that he is not liable for the additions to tax imposed *95 by section 294(d)(1)(A) of the 1939 Code and section 6654(a) of the 1954 Code. To reflect the stipulations of the parties, the concessions made by respondent, and the conclusions reached herein on the disputed issues, Decision will be entered for the petitioner in docket No. 2905-62. Decision will be entered under Rule 50 in docket No. 2906-62. Footnotes
1. Consolidated herewith is the case of Ida Morrof, Docket No. 2905-62.↩
2. The chronological history of this case is summarized at pages 556-560 of the official transcript of the proceedings. In view of what has occurred it is apparent that the petitioner has suffered from a "continuance psychosis." When his case was last set for trial on April 10, 1967, after due notice, the petitioner failed to appear. Consequently, the record herein was ordered closed because of petitioner's failure to pursue properly and diligently the trial of his case. The parties were directed to file briefs. Petitioner has filed no brief, although by direction of this Court he was served with a copy of respondent's brief on August 14, 1967, by certified mail pursuant to section 7455, Internal Revenue Code of 1954↩.
3. On January 14, 1964, Herbert Zuckerman was granted permission to withdraw as counsel for petitioner because of petitioner's "lack of cooperation." David Zuckerman declined to enter the case again in July 1966 for the same reason.↩
4. Most of the records produced by petitioner were "daily worksheets" kept in connection with his law practice for the years 1954, 1955, and 1956, which are incomplete and inadequate. Although petitioner was ordered by the Court to produce all records on which he intended to rely, he produced no books or records covering the years 1949 through 1953. If they ever existed, presumably they are now lost or destroyed.↩