WILLIAM DAPICE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dapice v. Commissioner
Docket No. 7744-80.
United States Tax Court
T.C. Memo 1983-377; 1983 Tax Ct. Memo LEXIS 407; 46 T.C.M. (CCH) 598; T.C.M. (RIA) 83377; June 27, 1983. Tony Mancuso, for the petitioner. Sandra M. Gilmore, for the respondent. COHEN
MEMORANDUM *409 FINDINGS OF FACT AND OPINION COHEN, Judge: By statutory notice dated February 29, 1980, respondent determined the following deficiencies in, and additions to, petitioner's Federal income taxes: Addition to Tax
Year
Deficiency
Sec. 6653(b) [1]
1972
$2,922.04
$1,461.02
1973
3,214.66
1,607.33
1974
3,858.40
1,929.20
1975
4,713.34
2,356.67
The issues for determination are: (1) Whether the statute of limitations bars the assessment and collection of the deficiency in income tax due from the petitioner, if any, for each of the taxable years 1972 through 1975; (2) whether petitioner is entitled to a deduction for losses or, alternatively, for bad debts for each of the taxable years 1972, 1973, 1974 and 1975; and (3) whether any part of the underpayment of tax, if any, for each of the taxable years 1972 through 1975 was due to fraud within the meaning of sections 6501(c)(1) and 6653(b). FINDINGS OF FACT Petitioner William Dapice resided in Syracuse, New York, at the time of filing the petition *410 herein and timely filed Federal income tax returns for the taxable years 1972, 1973, 1974 and 1975 with the Internal Revenue Center, Andover, Massachusetts. Petitioner is a high school graduate and attended Syracuse University for a brief period of time. Except for a 44-month period during which he served in the United States Air Force, he has always resided at a single address in Syracuse, New York. In December of 1965, petitioner was hired as a school custodian by Onondaga County and has continued to be so employed through the time of trial. During each of the taxable years at issue herein, his only sources of income were wages from that employment and interest earned at three savings institutions. The amounts of such income are set forth below: Year
Wages
Interest
Total
1972
$10,263.56
$6,784.04
$17,047.60
1973
11,956.86
7,690.95
19,647.81
1974
12,089.22
9,678.80
21,768.02
1975
12,127.85
12,056.87
24,184.72
Petitioner acquired a single family house at 236 Hazelhurst Avenue, Syracuse, New York, from his father in July of 1959. The house had been moved from another location prior to that acquisition and was uninhabitable. Petitioner *411 planned to eventually remodel the house so that it would be suitable for renting to others. In February of 1968, petitioner began the first of several endeavors to renovate the Hazelhurst house. He initially contracted with Claybourne Construction Co., Inc., (Claybourne) for the renovation. Claybourne began working on the house, but abandoned the job after less than one week. At that time petitioner had paid Claybourne $2,050 out of a total contract price of $6,200. Claybourne's efforts included removing some of the walls and part of the roof. As a result of such removal, portions of the interior of the house were left exposed to the weather. In the fall of 1969, petitioner contacted his nephew Frank Ventre, Jr., an attorney, regarding his possible legal recourse against Claybourne. Mr. Ventre suggested that an expert be hired to estimate the damages caused by the exposure of the interior of the house to the elements and to repair the roof. In November of 1969, petitioner engaged Evans Remodeling Corp. (Evans) to complete substantially the same work that Claybourne had been expected to perform. At that time part of the roof had been off of the house for approximately *412 21 months. Although petitioner had made some effort to protect the house by covering portions with plastic, the interior of the house and furniture therein had suffered severe damage from exposure to the elements. Evans worked on the house sporadically for several months. The work was largely defective, however, and was never completed. Out of a total contract price of $8,000, petitioner paid Evans $2,700 in 1969 and $3,500 in 1970. Petitioner next contracted with Metropolitan Builders (Metropolitan) in March of 1971 to complete the renovation of the Hazelhurst house. After completing less than one-half of the work specified in the contract, Metropolitan similarly abandoned the job in 1972. At that time petitioner had paid Metropolitan $3,200 of a $4,300 contract price. The house has remained uninhabitable through the time of trial. In 1972 petitioner's 1970 and 1971 tax returns were selected for audit.The issues examined for both years included certain itemized deductions claimed by petitioner. Under the heading "Taxes" and subheading "Other" on Schedule A, Form 1040, he claimed deductions for "EST, CIGARS, CIG., PHONE, UTILITY, ETC." (hereinafter the "other" taxes) *413 in the amounts of $38 and $43 for 1970 and 1971, respectively, and under the heading "Miscellaneous * * *" on that same schedule, he claimed deductions for "PROPERTY LOSS" in the amounts of $3,500 and $4,300 for 1970 and 1971, respectively. The deductions for "property loss" related entirely to amounts paid to the contractors who worked on the Hazelhurst house and to damages to the interior of that house and the furnishings therein caused by exposure to weather. The revenue agent examining petitioner's 1970 return disallowed the deductions described above. Petitioner did not agree with the revenue agent's proposed adjustments, and a district conference was held in January of 1973. Conferee Paul H. Smith, however, also determined that the deductions for the "other" taxes and "property loss" were not properly allowable for 1970. At that conference, Mr. Smith gave petitioner a handwritten note that provided: Ascertain if Claybourne Construction Co. Inc. is a defunct corporation as far as New York State is concerned. If so what year and date. If not bring suit against Claybourne Construction to recover on bad debt and damages under original contract dated 2/17/68. Then if *414 corporation goes bankrupt or defunct, bad debt is deductible in year debt is determined worthless. In re: William Dapice Syracuse, New York
In February of 1973 petitioner signed a Form 870 "Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment" and paid an additional tax of $974 with respect to the year 1970. At the time he signed the Form 870, petitioner believed, based in part on the contents of Mr. Smith's note, that the "property loss" would be deductible in a subsequent taxable year as a bad debt if he could prove the amount of damages and show that the contractors were bankrupt. The examination of petitioner's 1971 tax return similarly resulted in the disallowance of the deductions claimed for "other" taxes and "property loss," and a statutory notice of deficiency was mailed to him in February of 1973. Petitioner paid the proposed deficiency believing that he would be able to deduct the "property loss" as a bad debt on subsequent returns. Mr. Ventre filed a complaint on petitioner's behalf against Claybourne in the spring of 1972, but Claybourne did not respond. Mr. Ventre then contacted the attorney who had incorporated *415 Claybourne and thereafter concluded that it was no longer conducting business and had no assets. No further action was taken against Claybourne. Subsequent investigations by Mr. Ventre during the period of 1973 through 1975 led him to conclude that Evans and Metropolitan were also insolvent. Petitioner filed his 1972 tax return on April 14, 1973. On that return he again claimed deductions for "EST. CIGARS, CIG, PHONE, UTILITY, ETC." of $45 and casualty or theft losses of $4,500 (before reduction by the $100 statutory floor). He also claimed similar deductions on his 1973, 1974 and 1975 returns. Each of the deductions for "casualty or theft losses" related solely to amounts paid to contractors who worked on the Hazelhurst house during the period of 1968 through 1971 and estimated damages to that house and the furnishings therein caused by exposure to weather during that same period. During the years at issue petitioner had a total of 19 bank accounts at three banks. All of the accounts were in his name, social security number, and address. Except for one tax-deferred account held during a portion of this period, all of the accounts were regular savings accounts. Each year *416 petitioner received several Forms 1099 from these banks informing him of the amount of interest earned during that year. During this period petitioner made several transfers from one account to another account within the banks in order to maximize his interest income, but his only actual withdrawals from the banks were as follows: Date
Amount
Purpose
June 30, 1973
$1,200.00
Purchase of automobile
Nov. 24, 1973
988.18
Payment of Fed. Inc. Tax
Apr. 27, 1974
248.53
Payment of State Inc. Tax
In October of 1975, petitioner was notified that his 1973 tax return had been selected for examination. A report of audit changes issued the following month proposed to add $5,366 of interest income to his taxable income and to impose a 5 percent negligence addition under section 6653(a). Petitioner had reported no interest income on his 1972 and 1973 returns, nor was any interest income reported on his 1970, 1971, 1974 or 1975 returns. Petitioner was extremely upset by the proposed changes to his 1973 return and in January of 1976 presented himself without appointment at the local Internal Revenue Service office and spoke with Revenue Agent Musengo. He agreed *417 with the revenue agent that he had interest income in 1973, but denied that such income was taxable to him in that year. He stated that the interest income was not taxable because he had not removed the interest from the banks. He also stated that $5,366 was not the correct amount of interest earned in 1973 and that he would check with his banks and inform the agent of the correct amount of interest earned. Respondent subsequently voided the November 1975 report of audit changes. Petitioner again spoke with the Revenue Agent Musengo in April 1976 and again argued that his interest income was not taxable because he had not withdrawn it from the banks. Although he did check with his banks to determine the correct amount of interest earned in 1973, petitioner chose not to inform the revenue agent of the amount so determined. He was aware that the revenue agent could determine the correct amount of interest income from other sources. On May 27, 1976, two special agents presented themselves at the school where petitioner was employed and met with him. No appointment had been made, and petitioner had been given no advance notice of this meeting. The special agents informed him *418 that he was under investigation for possible criminal fraud with respect to his 1973 and 1974 taxable years. Petitioner answered questions regarding his background, but refused to give details of his interest income. He told the special agents that his interest income was not taxable because it had not been removed from the banks. Petitioner contacted Mr. Ventre in June of 1976 to determine whether interest earned but not withdrawn was currently taxable. Mr. Ventre stated that he would check into the question and respond when he had a chance. On July 7, 1976, petitioner met at respondent's office with two special agents regarding his 1973 and 1974 tax returns. He provided information regarding his "casualty or theft loss" deductions for 1973 and 1974, including copies of the contracts with Claybourne, Evans, and Metropolitan and pictures of the Hazelhurst house purporting to show the damages caused by exposure to the weather. He again refused to give details of his interest income and once again argued that his interest income was not taxable because it had not been withdrawn from the banks. Petitioner contacted Mr. Ventre a second time in September of 1976 to determine *419 whether his interest income was taxable. Mr. Ventre stated to him that interest, including interest that is not withdrawn from the bank, is taxable in the year that it is earned unless the interest-bearing deposits are held in some type of deferred account. Petitioner prepared each of his returns for his taxable years 1972 through 1975 without the benefit of advice from an accountant or an attorney. On each of these returns he claimed detailed itemized deductions, some of which were mistakenly taken. For example, he mistakenly claimed contributions carryovers from prior years even though his contribution deduction for each preceding year was not limited under section 170(b). On February 6, 1979, petitioner was indicted in the United States District Court for the Northern District of New York on four counts relating to the alleged filing of false returns for knowingly omitting interest income for each of the taxable years 1972, 1973, 1974 and 1975. Counts relating to allegedly false claims of casualty losses were dismissed on motion of the prosecution, and the case went to trial with respect to petitioner's failure to report the interest earned during those years. Petitioner *420 was subsequently acquitted by a jury of these charges. OPINION I. Preliminary Matters
Petitioner now concedes that the interest is taxable in the year it was earned and has introduced no evidence refuting the disallowance of the deduction for "other" taxes. Respondent's determination is therefore sustained as to those adjustments to petitioner's taxable income. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.Petitioner does assert, however, that he is entitled to deduct the amounts claimed as property or casualty loss and he denies that any part of the underpayment of his taxes was due to fraud within the meaning of sections 6501(c)(1) and 6653(b) for any of his taxable years 1972 through 1975. Before discussion of these substantive issues, however, an evidentiary question must be resolved. During the couse of the trial disputes arose over several items offered in evidence, and the Court's ruling on certain of them was delayed or reserved. [2] By the time the trial concluded, however, the only unresolved question *421 of admissability related to petitioner's proposed exhibit 78, a portion of a transcript of the testimony of Revenue Agent Musengo from the prior criminal proceedings. Petitioner has failed to show that Revenue Agent Musengo was unavailable as a witness at this trial or that any of the hearsay exceptions are applicable. Exhibit 78 is therefore inadmissible hearsay. Fed. R. Evid. 802. *422 The refusal of the Court to admit other items offered by petitioner on the issue of fraud could not prejudice him in view of our conclusion as to that issue set forth below. Petitioner does, however, complain of the Court's sustaining an objection to testimony of a Certified Public Accountant as to the deductibility of the claimed losses or bad debts and the refusal to admit as evidence of the deductibility of those losses statements contained in a handwritten note given to petitioner by Conferee Smith. The C.P.A. was called as an expert witness for the sole purpose of testifying as to whether, in his opinion, petitioner was entitled to deductions under sections 165(c)(2), 165(c)(3), or 166. The C.P.A. did not assist or advise petitioner in the preparation of petitioner's returns for any of the taxable years 1970 through 1975. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in *423 the form of an opinion or otherwise." Fed. R. Evid. 702. The testimony of the C.P.A. was limited, however, to legal opinions rather than to factual matters that would assist the trier-of-fact. "As Professor Wigmore has observed, expert testimony on law is excluded because 'the tribunal does not need the witness' judgment * * * [T]hejudge (or the jury as instructed by the judge) can determine equally well * * *.' The special legal knowledge of the judge makes the witness' testimony superfluous." Marx & Co. v. Diners' Club, Inc.,550 F.2d 505, 510 (2d Cir. 1977). Respondent challenged petitioner's testimony that Conferee Smith gave him a handwritten note (Exhibit 70) in January 1973 stating that he may be entitled to deductions for bad debts in future years. The note was admitted as evidence for purposes limited to petitioner's credibility as to his belief that he could deduct the purported bad debts. The note was not admitted, however, as evidence that petitioner was actually entitled to bad debt deductions or that respondent is estopped to deny such deductions. The note assumed the subsequent occurrence of facts not shown to have in fact occurred. In *424 any event, respondent is not bound by the erroneous, inaccurate or incomplete advice of his agents. McGuire v. Commissioner,77 T.C. 765, 779-780 (1981). II. Limitations
Section 6501(a) generally provides that tax must be assessed within 3 years after the filing of a return or the due date for the return, whichever is later. The statutory notice of deficiency was issued February 29, 1980, more than 3 years after petitioner filed his 1972, 1973, 1974 and 1975 returns. Accordingly, assessment of deficiencies for those years is barred unless respondent affirmatively shows that the return for each such year was false or fraudulent with the intent to evade tax, permitting assessment at any time (section 6501(c) (1)), or, for those years other than 1972, that omitted income for each such year exceeded 25 percent of the amount of the gross income stated in that return, permitting assessment within 6 years after the return was filed or due, whichever is later (section 6501(e) (1) *425 (A)). For reasons subsequently set forth, we conclude that respondent has failed to carry his burden of proving that petitioner's 1972, 1973, 1974 or 1975 returns were fraudulent within the meaning of sections 6501(c) (1) and 6653(b). To avoid the bar of limitations respondent therefore must show that the requirements of section 6501(e) (1) (A) are satisfied. The amount of gross income reported by petitioner and the amount of interest income omitted for each of the years 1973, 1974 and 1975 are as follows: Gross Income
Interest Income
Percent of
Stated in
Omitted From
Stated Gross
Year
Return
Return
Income Omitted
1973
$11,956.86
$7,690.95
64 %
1974
12,089.22
9,678.80
80 %
1975
12,127.85
12,056.87
99 %
The statutory notice was therefore timely issued for 1973, 1974 and 1975. Assessment of deficiency for 1972 is barred, however, because the notice was issued more than 6 years after that return was filed. III. Losses or Bad Debts
The next issue for determination is whether petitioner is entitled to deductions for losses or, alternatively, for bad debts for each of the taxable years 1973, 1974, and 1975. Petitioner asserts *426 that he is entitled to a deduction for losses incurred in transactions entered into for profit under section 165(c) (2); losses from storm, casualty or theft under section 165(c) (3); or a deduction for bad debts under section 166. These deductions relate entirely to the Hazelhurst house. The provisions for losses and bad debts are mutually exclusive. Spring City Foundry Co. v. Commissioner,292 U.S. 182, 189 (1934). Petitioner argues that he suffered losses from payments to Claybourne, Evans, and Metropolitan in excess of the value of their work, from damages to the Hazelhurst house caused by the faulty work of those contractors, and from damages to that house and its furnishings caused by exposure to the weather.The pertinent portions of section 165 provide: (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated by insurance or otherwise. (c) Limitation on Losses of Individuals.--In the case of an individual, *427 the deduction under subsection (a) shall be limited to-- (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. * * * (e) Theft Losses. -- For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.
[Emphasis supplied.] The interior of the Hazelhurst house was exposed to the weather from February of 1968 through November of 1969. All amounts advanced by petitioner to Claybourne, Evans, and Metropolitan were paid, and all work done by those contractors was performed, during the period 1968 through 1972. Petitioner was aware in 1972 that each of those contractors had abandoned their work on the house. With one exception not herein applicable, losses are deductible under section 165 in the taxable *428 year the loss was sustained or, in the case of theft losses, in the year the loss was discovered. Petitioner's losses thus would be deductible, if at all, in years prior to 1973 and are not properly allowable for his 1973, 1974 or 1975 taxable years. [3]
Petitioner alternatively asserts that the excess of his advances to Claybourne, Evans, and Metropolitan over the value of their work is deductible as a bad debt under section 166. [4]Only a bona fide debt qualifies for purposes of section 166, and a bona fide debt is "a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Sec. 1.166-1(c), Income Tax Regs; Hardy v Commissioner,54 T.C. 1194 (1970).
*429 Generally, a claim arising out of a breach of contract, prior to being reduced to judgment, does not create such a debtor-creditor relationship because the injured party has only an unliquidated claim for damages. Lewellyn v. Electric Reduction Co,275 U.S. 243, 246 (1927); Proesel v. Commissioner,77 T.C. 992, 1002 (1981); DeLorenzo v. United States,308 F. Supp. 52, 53 (D. Ore. 1969); Schaff v. Commissioner,46 B.T.A. 640, 645-646 (1942); see also Carlisle v. Commissioner,37 T.C. 424 (1961); Hanes v. Commissioner,2 T.C. 213 (1943). Petitioner's claims against Claybourne, Evans and Metropolitan were unadjudicated claims for breach of contract and, accordingly, no debtor-creditor relationship existed as required by section 166. Petitioner argues that the facts in Martin v. Commissioner,38 T.C. 188 (1962), are squarely on point with the facts in this case. In Martin, the taxpayers engaged contractors to build a house. At or about the time the house was completed *430 various mechanics and materialmen filed liens against the taxpayers' house as security for various amounts due for services and supplies furnished and for which they had not been paid by the contractors. After being advised by counsel that they might otherwise lose their house, taxpayers paid and satisfied the claims secured by the liens. These claims were uncollectible as against the contractors at the time they were paid and satisfied. We concluded in Martin that the taxpayers were entitled to a deduction for nonbusiness bad debts, stating: "When * * * [taxpayers] made the payments here involved they became subrogated to the debts owed to the mechanics and materialmen by the contractors and thereby became creditors of the contractors." Martin v. Commissioner,supra at 191. The Martin case is clearly distinguishable from this case. In Martin, the taxpayers only became creditors of the contractors when they paid and satisfied the claims of the mechanics and materialmen and thereby became subrogated to their claims against the contractors.The amounts of their claims against the contractors were clearly established by the evidence of actual payments *431 made for which the contractor was undoubtedly liable. Petitioner's evidence in this case falls far short of showing that he would have established his claims against the contractors if they had been pursued. [5] We therefore conclude that petitioner's claims are not deductible as bad debts under section 166.[6]
*432 IV. Fraud
The final issue for resolution is whether any part of the underpayment of tax for any of the taxable years 1972 through 1975 was due to fraud within the meaning of sections 6501(c) (1) and 6653(b). Fraud, within the meaning of those sections, is an intentional wrongdoing with the specific intent to evade a tax believed to be owed. Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958); Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939). The existence of fraud is a question of fact to be gleaned from the entire record. Marcus v. Commissioner,70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980); Stratton v. Commissioner,54 T.C. 255 (1970). Respondent has the burden of proving by clear and convincing evidence that some part of the underpayment was due to fraud. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Levinson v. United States,496 F.2d 651 (3d Cir. 1974); *433 Miller v. Commissioner,51 T.C. 915, 918 (1969). Respondent will carry his burden if he shows that the taxpayer intended to evade taxes that he knew or believed he owed by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107 (1956). Fraud may be established by showing an overstatement of deductions as well as by an omission of income. Neaderland v. Commissioner,52 T.C. 532, 540 (1969), affd. 424 F.2d 639 (2d Cir. 1970). Fraud is never imputed or presumed and courts should not sustain findings of fraud upon circumstances which at most create only suspicion. Green v. Commissioner,66 T.C. 538, 550 (1976); Olinger v. Commissioner,234 F.2d 823, 824 (5th Cir. 1956), affg. and revg. a Memorandum Opinion of this Court; Davis v. Commissioner,184 F.2d 86, 87 (10th Cir 1950), revg. a Memorandum Opinion *434 of this Court; Cirillo v. Commissioner,314 F.2d 478, 482 (3d Cir. 1963), affg. in part and revg. in part a Memorandum Opinion of this Court; Shaw v. Commissioner,27 T.C. 561, 569-570 (1956), affd. 252 F.2d 681 (6th Cir. 1958). Respondent contends that in each of his taxable years 1972 through 1975 petitioner received taxable interest income that he fraudulently failed to report, fraudulently claimed casualty loss deductions, and fraudulently claimed "additional sales tax" deductions. We consider separately each of these contentions. A. Interest Income
Petitioner concedes that he earned taxable interest income in 1972, 1973, 1974 and 1975 and that he failed to report that income for those years. He denies, however, that such failure to report was fraudulent. Petitioner asserts that he believed that interest earned was not taxable until removed from the bank and that because he had not removed his interest earned from the banks, such interest was not taxable to him. [7]
*435 Respondent argues that petitioner's fraudulent intent is shown by the following: (1) Petitioner was put on notice that his interest income was taxable by the receipt of several Forms 1099; (2) he prepared each of his own income tax returns without advice from anyone, including claiming detailed itemized deductions; (3) he consistently omitted substantial amounts of interest income for several consecutive years; (4) he was evasive and failed to cooperate with respondent's investigation; and (5) his explanation for failure to report the interest income is implausible and inconsistent with his pattern of transfering and withdrawing funds from the banks. The receipt of several Forms 1099 does not necessarily show that petitioner knew that his interest income was taxable. It would be consistent with a belief that interest income is not taxable until removed from the bank to ignore the forms unless he had withdrawn the interest. The fact that petitioner received several rather than a few of those forms is unpersuasive. The fact that petitioner prepared each of his own returns without the advice of anyone and that he consistently omitted interest income from each of his returns *436 tends to support rather than detract from his argument. If he had sought expert advice and then omitted the interest income from his returns we would be inclined to disbelieve him. Respondent would have us infer that petitioner was knowledgable to tax matters because he claimed detailed itemized deductions. This implication would be inconsistent, however, with the fact that petitioner improperly claimed itemized deductions for contributions carryovers from prior years on each of those same returns. Similarly, if petitioner had included interest income that was not withdrawn from the banks on some returns and not on others we would tend to disbelieve his argument. The fact that he consistently failed to report such income supports his position. The failure to cooperate with an investigation is not highly persuasive of fraudulent intent where mitigating factors explain such behavior. Petitioner's uncooperative conduct was limited to matters relating to his interest income. He did fail to inform a revenue agent of the correct amount of his interest income for 1973 after stating to the agent that he would do so. He was aware, however, that respondent could obtain this information *437 without the benefit of his cooperation and that his actions would not ultimately deprive respondent of this information. During the examination of his 1973 and 1974 returns, two special agents presented themselves at petitioner's place of employment without an appointment. Petitioner, extremely upset by this action, still agreed to meet at respondent's office where he provided information regarding his background and copies of contracts, cancelled checks, and photographs relating to his claimed casualty losses.Although his conduct was far from exemplary, we fail to find it persuasive of fraudulent intent. Respondent's final argument is that it is implausible to believe that petitioner did not know that his interest was taxable and that his pattern of transfering and withdrawing money was inconsistent with his explanation. Petitioner held each of the 19 bank accounts in his correct name, address, and social security number. He freely admitted to respondent that he had interest income and consistently stated on at least four occasions to three different agents his explanation that the interest income was not taxable until removed from the banks. In June and September of 1976 he *438 checked with his attorney to determine if his interest was taxable. Respondent has not shown any of petitioner's statements to be inconsistent or false.
The fact that petitioner transferred funds within the banks to maximize his interest income is not necessarily inconsistent with his explanation because the funds remained in the banks after the transaction was completed. We are troubled, however, by the fact that he did make three withdrawals during the period of 1972 through 1975 without reporting any interest income. Unfortunately the record is devoid of any clear explanation of this omission. It is possible that he believed that he was withdrawing only principal rather than interest, and it is possible that because there were only two withdrawals in 1973 and only one in 1974 he simply forgot to report that portion of his interest income. Because respondent bears the burden of proof on this issue, the gaps in the evidence must be resolved in petitioner's favor. Respondent asserts that petitioner's testimony is "unworthy of belief." After extensive cross-examination, and after having the opportunity to do so, however, respondent failed to show any falsity in petitioner's statements. *439 [8] For example, petitioner offered into evidence a note purportedly written by Conferee Smith. Respondent's counsel stated at trial, "[T]hey would not have sent you a handwritten letter like that, so that's not the truth." If respondent could show that petitioner had forged Mr. Smith's handwriting on the note it would be clear evidence of fraud. Respondent failed, however, to call Mr. Smith as a witness or to explain his absence. B.Casualty Loss Deductions
Respondent argues that petitioner fraudulently claimed casualty loss deductions in 1972, 1973, 1974 and 1975. Petitioner had previously claimed "property loss" deductions in his 1970 and 1971 returns.Upon audit, those deductions were denied and petitioner conceded such denial before filing his 1972 return. According to respondent, this is clear evidence that petitioner claimed deductions that he knew that *440 he was not entitled to take.
Petitioner asserts that at the time he conceded the changes in his 1970 and 1971 returns, he relied on advice of Conferee Smith and believed that he was entitled to deduct those losses in subsequent years as bad debts if he could prove the amount of the losses and that the contractors were insolvent. His attorney filed a complaint against Claybourne in the spring of 1972 and determined after some investigation that Claybourne had no assets at that time. The attorney subsequently concluded during the period 1973 through 1975 that Evans and Metropolitan were also insolvent. Respondent claims that the testimony of the attorney, petitioner's nephew, is "biased", but the testimony is credible and uncontradicted. Respondent further argues that petitioner's explanation is incredulous because petitioner claimed casualty losses rather than bad debt deductions in 1972, 1973, 1974 and 1975. We note that petitioner's returns for each of the years 1970 through 1975 consisted solely of a Form 1040 with a Schedule A attached. There is no line on any of the Form 1040's or on the Schedule A's entitled "bad debts." Petitioner entered his claimed deduction for each *441 year at issue on Schedule A under the preprinted heading "Casualty or theft loss(es)." It is possible under these circumstances that he thought he was properly claiming bad debt deductions. Where a taxpayer merely enters a deduction to which he believes he is entitled on the incorrect line of his return, we are extremely reluctant to find an improper motive. C.Deductions for Taxes
On each of the returns for 1970 through 1975 petitioner claimed on Schedule A under the heading "Taxes" a deduction for sales tax calculated in the optional sales tax tables and, under the subheading "Other," a deduction for "EST. CIGARS, CIG, PHONE, UTILITY, ETC." in the following amounts: Year
Amount
1970
$38.00
1971
43.00
1972
45.00
1973
50.00
1974
60.00
1975
65.00
The deductions for "other" taxes were disallowed during the audit of petitioners' 1970 and 1971 returns. Respondent argues that because petitioner conceded the disallowance of such deductions before filing his 1972 return, he knew that he was not entitled to these additional "sales" tax deductions above the sales tax table amount. [9]
*442 The primary issues during the audit of petitioner's 1970 and 1971 returns were deductions for "property loss" in the amounts of $3,500 and $4,300, respectively. That petitioner strongly contested the disallowance of a total of $7,800 of deductions but did not contest the disallowance of a total of $81 in deductions is not an indication that he knew and agreed that such a de minimis amount of "other" taxes were not deductible. In addition, petitioner clearly disclosed these deductions in his returns and it cannot, therefore, be said that he intended to conceal or to mislead respondent.
D. Conclusion
Respondent's evidence with respect to fraud [10] is not clear and convincing and does not satisfy his burden of proof. *443 Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Much of the confusion in the record and a great deal of wasted time resulted from the unreasonable refusal of petitioner's counsel to stipulate prior to trial to undisputed exhibits, such as bank records, unless respondent would stipulate to other, disputable, items. Petitioner's counsel has persisted in his recalcitrance (and disregard of this Court's rules) in his briefs by, among other things, predicating factual statements on items not admitted in evidence and on hearsay statements in exhibits admitted for limited purposes. For example, petitioner's briefs make numerous references to petitioner's I.Q. based upon a high school transcript admitted solely for the purpose of showing courses taken by petitioner and in response to respondent's evidence that petitioner had a "business major." The Court repeatedly stated that such evidence would not be considered as establishing petitioner's level of intelligence (over 30 years later), and it is not.Other references to inadmissible and unadmitted items are similarly disapproved and disregarded.↩
3. We do not discuss, therefore, the adequacy or inadequacy of petitioner's proof as to the amounts↩ claimed by him to have resulted from various factors.
4. The pertinent part of that section provides: (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. (b) Amount of Deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
5. Petitioner offered "opinion" evidence from a witness who examined the Hazelhurst house in 1979 (more than 6 years after the last work by the contractors) and estimated that the amount paid by petitioner to each contractor exceeded the value of the work performed by each of them. This witness testified that he was only able to tell what work each contractor did "to a point." There are many reasons, however, why the contractors may have justifiably failed to complete their work and petitioner would not be entitled to damages. For example, petitioner testified that part of the reason why Claybourne terminated its efforts was that petitioner was unable to obtain a required zoning variance; also the amount of damages, if any, may have been reduced because of petitioner's failure to replace the roof or otherwise mitigate damages for a period of 21 months. ↩
6. We do not agree with respondent's arguments concerning the adequacy of petitioner's proof that the contractors were insolvent, but we do not need to further discuss that issue because of our conclusion that no debts were established.↩
7. Petitioner argues that the fact that he was acquitted of criminal charges of filing false returns should be considered by this Court "as an important circumstance to be weighed in favor of * * * [him] on the issue of fraud." Petitioner's acquittal of criminal charges is not a bar to a finding of civil fraud covering the same years. The difference in degree of the burden of proof in criminal and civil cases precludes application of the doctrine of res judicata. Helvering v. Mitchell,303 U.S. 391 (1938); Lias v. Commissioner,24 T.C. 280 (1955), affd. 235 F.2d 879 (4th Cir. 1956); De Angeles v. Commissioner,T.C. Memo. 1983-78; Woo v. Commissioner,T.C. Memo. 1963-278↩.Because of the more stringent burden of proof in criminal cases, we attach no significance to petitioner's prior acquittal.
8. This is a close case, and our conclusion is based on the totality of circumstances in this record and our observation of the petitioner as a witness. The same contention by another petitioner in another case might well be incredible and could well support the opposite inference as to fraudulent intent.↩
9. It is not clear that petitioner intended to claim sales tax deductions in addition to the table amount. The returns on their face suggest that he was mistakenly claiming deductions for excise taxes paid on cigars, cigarettes, telephone, utilities, etc.↩
10. Respondent somewhat weakly asserts that fraud is indicated by the fact that petitioner's disposable take-home wages after making savings deposits (several of which constituted 100 percent of his pay check) were less than the amount of his total itemized deductions in each of the taxable years in issue. This argument fails to account for the fact that some of the deductions were for noncash items (e.g., casualty losses) and some of the deductions were for items withheld from his wages (e.g., state income tax).↩