JOHN H. O'SHEERAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
O'Sheeran v. Commissioner
Docket No. 28911-81.
United States Tax Court
T.C. Memo 1983-702; 1983 Tax Ct. Memo LEXIS 87; 47 T.C.M. (CCH) 405; T.C.M. (RIA) 83702; November 28, 1983. John H. O'Sheeran, pro se. Joseph R. Peters *88 and James M. Klein, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined the following deficiencies in and additions to petitioner's income taxes: Additions to Tax
Year
Deficiencies
[1] Sec. 6653 (b) Sec. 6654
1971
$17,153.27
$8,576.64
$547.59
1972
14,623.60
7,311.80
466.83
1973
49,880.18
24,940.09
1,592.34
1974
61,249.99
30,625.00
1,955.29
1975
81,169.97
40.584.99
3,502.09
1976
225,263.35
112,631.68
8,389.67
1977
2,718.00
1,359.00
96.84
The questions presented for decision are: (1) Whether petitioner had unreported income during the years in issue in the determined amounts; (2) if so, whether petitioner is liable for additions to tax under section 6653(b) (fraud) or, in the alternative, under sections 6651(a) (failure to file returns) and 6653(a) (negligence); and (3) whether petitioner is liable for additions to tax for failure to pay estimated taxes.
FINDINGS OF FACT This case was *89 stipulated in part, and the stipulation of facts and attached exhibits are incorporated herein by reference. Petitioner resided in Wisconsin during the years in issue and when he filed his petition herein. Petitioner has been involved in one speculative venture or another almost all of his life, and, by his own estimation, has "had more jobs in [his] lifetime tham most men would have in three or four." He describes himself as "a man who has handled over $3,000,000 in cash and tried to build a business." Nonetheless, the last time petitioner filed a personal income tax return was in 1949 or 1950; he claims that he has not had any taxable income since then. Petitioner does not deny receiving the amounts determined by respondent to be income, but he argues that these amounts are not taxable because they were loans. Petitioner, his companion Michele Collins (Michele), and their children moved to Wisconsin in 1969. Their assets at that time consisted of two cars, an inoperative helicopter designed by petitioner, and Michele's $500 per month survivor's pension. They also had some funds petitioner had "borrowed" [2] from William B. Witteman and Leand Wangnild. At that time petitioner *90 owed Ms. Wangnild approximately $64,000 plus interest, and he owed Mr. Witteman approximately $31,000. Mr. Witteman continued lending money to petitioner after petitioner's move to Wisconsin, and, apart from Michele's pension, Mr. Witteman's funds were then petitioner's sole source of support. Petitioner told Mr. Witteman that the funds were for the promotion of his helicopter venture, although petitioner already knew that the helicopter was unmarketable. In addition, once a year, petitioner would plead impending familial poverty as the Christmas holidays approached in order to obtain additional funds from Mr. Witteman. Petitioner received support from Mr. Witteman throughout the years in issue, and respondent has conceded that the amounts determined to be from Mr. Witteman may be eliminated from his determination of income. Petitioner also received a $100,000 loan from William Lee in 1974; this amount was not included by respondent in the notice of deficiency. Although petitioner denies being a religious man, in or prior to 1971 he obtained *91 mail-order divinity degrees from Ohio Christian College, an unaccredited school, and the Life Science Church. Michele also obtained a degree from the Life Science Church, and both she and petitioner began using the title "doctor." Meanwhile, petitioner started developing plans to market a type of prefabricated housing he had designed and patented, and, in furtherance of those plans, he formed Milwaukee Shell Corporation ("MSC" or "the corporation") in 1972 or 1973. Petitioner was the initial president of MSC, and Michele served as secretary/treasurer and kept the corporate records. Vernon G. Peterson and Duane J. Juliot were the other initial officers of the corporation. Minutes of the fifth meeting of the board of directors of MSC, held on August 10, 1973, reflect the adoption of the following resolutions, among others: * * * 2. Any of the officers or directors of MSC shall have the power and authority to personally borrow any and all funds from the corporation which in their opinion is necessary to the functional best interest of MSC, directly or indirectly, in the maintenance of their stability of living and business equilibrium; and said personal loans shall be construed *92 to be approved by the board of directors, simply by the existence of the loan itself, singly or in numbers. * * * 3. In return for the use of John O'Sheeran's home for corporate meetings, and in lieu of rent on the office that John O'Sheeran borrowed $5,000.00 FHA and borrowed $3,000.00 otherwise on personal signature, to build for MSC; MSC shall repay John O'Sheeran in labor, materials, or cash, or both, whichever in his discretion is to his best interest at the time. Further, said addition to John O'Sheeran's house shall be his; clear of any obligation to MSC, when MSC moves its offices from his premises. * * * * * * 10. Vernon Peterson, Duane Juliot and John O'Sheeran, and/or anyone designated by them, shall have the power and authority to collect, borrow, promote, or disburse funds in any manner whatsoever, which in their opinion is in the best interest of MSC, whether directly or indirectly, they shall further have the power and authority to utilize the labor and materials of MSC in any manner whatsoever, which in their opinion is in the best interest of the corporation, whether directly or indirectly. * * * 11. Since John and Michele O'Sheeran are working full time *93 for MSC, it is to the best interest of MSC that the Corporation pay for domestic help for the O'Sheerans, so that their chores and household problems are solved, freeing them for corporate dedication and safeguarding their children and home, and it is so resolved. * * * * * * 15. Duane Juliot, Vernon Peterson, Michels O'Sheeran and John O'Sheeran shall all have the authority, at any time to collect and/or deduct any funds from any MSC account or accounts, any portion of any funds owed to them by MSC, which in their opinion the continued deprival thereof, would or could, work or cause a heardship upon them. * * * * * * 25.The signature of whichever senior officer or board member chairs a meeting, accompanied by the seal, shall constitute waiver of signature and approval of all members. These minutes were signed by petitioner only. Sometime in 1973, petitioner and his associates began selling interests in a joint venture involving MSC. Petitioner promoted MSC as a "Christian" business, and, to induce people to invest in the venture, he told them that the profits earned by MSC would be used to build a Christian church and school. Petitioner inspired trust and confidence, *94 especially among people interested in supporting Christian Activities, and he and the other officers succeeded in selling 133 joint venture interests to people in five different states. The State of Wisconsin began investigating his activities in 1974, and petitioner and his associates were enjoined from selling joint venture interests. Petitioner subsequently pleaded guilty to violating state securities laws. This setback did not end petitioner's fund-raising activities, however. Petitioner merely stopped selling joint venture interests and began soliciting "loans." Once again, he exploited his "Christian" affiliations to get people to part with their money. This time he told his supporters that only he could lend money to MSC directly so they made their checks payable to petitioner. Petitioner received at least $573,000 from numerous individuals between 1974 and 1976. A few of these people demanded and received repayment of their money, but the majority of them did not. MSC never did acquire the capability to build the housing petitioner promised, and the corporation eventually declared bankruptcy. Four model homes erected by MSC were sold at a foreclosure sale to help *95 satisfy creditors' claims.Petitioner was subsequently convicted of concealing an asset from a trustee in bankruptcy and was incarcerated in the Metropolitan Correction Center in Chicago, Illinois. While MSC was still in operation, petitioner maintained a checking account in MSC's name with the bank of Spring Valley in Plum City, Wisconsin. Petitioner had two personal checking accounts held jointly with Michele, one with Spring Valley, and the other with the Security National Bank of Durand, Wisconsin. Michele wrote all of the checks drawn on MSC's bank accounts and prepared all of the deposit slips. Despite maintaining personal checking accounts, petitioner and Michele did not attempt to keep their personal finances separate from MSC's, and they had and exercised the unfettered ability to use MSC's funds for personal needs. For example, Michele constantly shifted funds between the corporate and personal accounts and withdrew money from MSC's account or drew checks on it to suit her and petitioner's personal convenience.
Michele tried to file corporate returns, but petitioner told her not to pay the taxes, even when the funds were available, because he did not believe in it. *96 He also told her that he arranged to have his financial receipts look like loans to avoid paying income taxes. Petitioner did allow Michele to pay the payroll taxes on occasion, however. In addition, petitioner instructed Michele to mark each record of deposit with the notation "loan to MSC from JOS [petitioner]" so that it would appear as if petitioner had put large sums of his money into the corporation. Petitioner acquired significant assets and personal belongings and lived in an affluent manner during the years in issue. For example, he bought a house with a swimming pool situated on 40 acres of land that in 1976 he valued at $150,000. He purchased a Rolls Royce, two Lincolns, two Jeeps, a Ford Bronco, a Volkswagen, a camper, trail bikes, golf carts, snowmobiles, and bicycles. He owned three airplanes and two diamond rings. In addition, petitioner had two rooms full of clothing and close to 40 pairs of shoes and boots, including numerous pairs of cowboy boots made of expensive hides such as ostrich and python that cost several hundred dollars a pair. He purchased between 50 and 75 guns of various types, sporting and camera equipment, and two 17-foot boats. He also *97 owned 71 percent of MSC's outstanding shares. Petitioner's largesse was not confined to himself. He bought jewelry worth over $50,000 and a 75-piece model elephant collection for Michele, and he gave the children money, sporting goods, and toys. He stuffed their 20-room home with furniture, including eight couches.
On a signed financial statement dated April 15, 1974, petitioner claimed a net worth of $1,779,750 and a guaranteed annual income of $60,000. On another financial statement dated May 7, 1976, signed by petitioner and submitted to obtain a loan, petitioner listed substantial assets and net worth. Neither financial statement listed liabilities consistent with petitioner's present contention that all moneys received by him during the years in issue were loans. On October 22, 1975, Lawrence D. Lindquist, an Internal Revenue agent, began an investigation of petitioner's 1973 and 1974 tax liability by writing petitioner to request an appointment. Two days later he received a letter in response from Roger L. Gierhart, who identified himself as petitioner's attorney and informed Mr. Lindquist that petitioner would not attend the proposed meeting and would not meet with *98 the Internal Revenue Service without Mr. Gierhart's presence. The letter also reported that "Mr. O'Sheeran has not filed Federal income tax returns for the reason that he has not had any taxable income during the years in question." On at least 14 occasions in 1976, Mr. Lindquist contacted representatives of petitioner in an attempt to secure copies of corporate returns and records of MSC. These attempts were unsuccessful. From July 11, 1979, to February 7, 1980, Mr. Lindquist made at least 6 attempts to communicate with petitioner concerning Mr. Lindquist's proposed determination of deficiencies. Mr. Lindquist provided to petitioner a ledger sheet that showed most, if not all, of the items included in the proposed deficiency.During this period of time, petitioner was incarcerated, and a meeting requested by Mr. Lindquist for the purpose of discussing his computations was several times postponed so that it could occur after petitioner's release. Although petitioner was released on or about February 13, 1980, he failed to comply with the request for a meeting or otherwise to communicate with Mr. Lindquist until shortly before the trial of this case. Additional information concerning *99 funds received by petitioner and payments made by him during the years in issue was not delivered until petitioner testified at trial (and after Mr. Lindquist testified). After the trial in this matter, Mr. Lindquist reviewed his work papers in light of the information provided to him at trial and adjusted his calculations to include the new information. He also examined petitioner's personal account to give credit for payments made from those accounts for expenses claimed by petitioner to belong to MSC. Based upon Mr. Lindquist's post-trial report, respondent has conceded downward adjustments of petitioner's taxable income as follows: Year
Amount
1971
$16,830.30
1972
14,801.25
1975
45,935.32
1976
172,487.69
1977
930.00
ULTIMATE FINDINGS OF FACT 1. Petitioner had unreported taxable income during the years in issue in the amounts determined by respondent, after adjustment for respondent's post-trial concessions. 2. Petitioner's failure to report his taxable income in 1971 through 1977 was due to fraud. 3. Petitioner is liable for additions to tax under section 6654 for failure to pay his estimated tax. OPINION Issue 1: Income
*100 A taxpayer is required to maintain books and records that will enable him to file a correct return. Sections 1.446-1(a)(4) and 1.6001-1(a), Income Tax Regs. If a taxpayer fails to maintain adequate records, respondent is authorized to reconstruct the taxpayer's income in accordance with such method as in his opinion clearly reflects income. Section 446(b). Petitioner did not file returns for any of the years in issue, did not maintain adequate books and records, and would not meet with respondent to help ascertain his tax liability. Respondent was thus compelled to reconstruct petitioner's income. He chose to examine petitioner's banking and business transactions and his personal expenditures to determine the deficiencies specified in the statutory notice. Petitioner does not dispute that he had possession and use of the funds that respondent determined to be income, but he claims that the funds were loans and are, therefore, not taxable. The language of section 61, "all income from whatever *101 source derived," has been held to encompass within the definition of gross income all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 431 (1955). A gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." Rutkin v. United States,343 U.S. 130, 137 (1952). As the Supreme Court stated in James v. United States,366 U.S. 213, 219 (1961): When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." North American Oil Consolidated v. Burnet,supra, 286 U.S. at page 424, 52 S. Ct. at page 615. *102 In such case, the taxpayer has "actual command over the property taxed--the actual benefit for which the tax is paid," Corliss v. Bowers,supra.This standard brings wrongful appropriations within the broad sweep of "gross income"; it excludes loans. * * * This rule has been repeatedly applied. See Moore v. United States,412 F.2d 974 (5th Cir. 1969); United States v. Rochelle,384 F.2d 748 (5th Cir. 1976); Cohen v. United States,297 F.2d 760 (9th Cir. 1962); Briggs v. United States,214 F.2d 699 (4th Cir. 1954); McSpadden v. Commissioner,50 T.C. 478 (1968). We are persuaded in this case that there was no "consensual recognition, express of implied, of an obligation to repay" the sums advanced. James v. United States,supra.The label "loan" ascribed to the funds by petitioner is not conclusive of their true nature in the absence of any evidence of an intention to make repayment at the time of the taking. Leaf v. Commissioner,33 T.C. 1093 (1960), affd. 295 F.2d 503 (6th Cir. 1961). The evidence adduced at trial demonstrates *103 that petitioner had no intention of ever repaying the sums received.Petitioner was already heavily in debt he began the activities described herein, and he had no real prospect of repaying his purported lenders except, perhaps, by additional "borrowing." Even if the funds received were initially regarded as loans, because the result of his activity was to obtain funds far exceeding his ability to repay his creditors, it can readily be inferred that he did not intend to repay them. See United States v. Rosenthal,470 F.2d 837, 841 (2d Cir. 1972). The fact that certain sums were repaid does not prove that petitioner recognized an obligation to repay; rather, it suggests that he recognized that the best way to keep up the flow of cash was to repay the few who demanded it. Petitioner's control over the funds was absolute. The money was delivered to him personally, although it was usually intended for MSC, and petitioner could -- and often did -- choose to deposit it in his own bank account instead of the corporation's. Petitioner controlled MSC and effected corporate resolutions that permitted him to remove funds from the corporation for his own use without appearing *104 to be stealing from the corporate purse. Finally, petitioner admitted that he commingled funds and used the money to support himself and his family in what can only be described as an extravagant lifestyle. It is indisputable that the amounts in dispute were "accessions to wealth, clearly realized, * * * over which [petitioner had] complete dominion." Commissioner v. Glenshaw Glass Co.,supra.
Petitioner has failed to show any errors in respondent's final schedules of income items and allowable deductions, and we must therefore sustain the deficiencies as finally computed. Issue 2: Fraud
The 50-percent addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell,303 U.S. 391, 401 (1938). Respondent has the burden of proving, by clear and convincing evidence, that the underpayment of taxes for each year was due to fraud. Section 7454(a); *105 Rule 142(b), Tax Court Rules of Practice and Procedure. This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). *106 Failure to file tax returns, without more, is not proof of fraud; such omission may be consistent with a state of mind other than the intention and expectation of defeating the payment of taxes. Stoltzfus v. United States,supra;Cirillo v. Commissioner,314 F.2d 478, 482 (3d Cir. 1963), revg. a Memorandum Opinion of this Court.[3] Failure to file, however, may be considered in connection with other facts in determining whether any deficiency or underpayment of tax is due to fraud. Beaver v. Commissioner,supra at 93. In this case, petitioner claims he did not file tax returns because he believed that all of his receipts were nontaxable loans; the evidence, however, belies petitioner's self-serving statement. Petitioner demonstrated at trial a high level of intelligence, analytical ability, and shrewdness. We do not believe that petitioner really thought it was permissible to attach the label "loan" to receipts, to exercise unfettered control over them, to not repay his lenders, and to escape taxation legally. It is much more consistent with the overwhelming evidence in this case to conclude, instead, that petitioner *107 thought he could circumvent the tax laws by manipulating funds and people, which he did with apparent ease, and that he failed to file returns because he did not want to pay any taxes, not because he honestly believed he did not have taxable income. Michele testified at trial that petitioner told her that he did not believe in paying taxes and therefore instructed her to label receipts as loans. Petitioner tried to impeach Michele's testimony by demonstrating bias caused by the deterioration of their relationship and by showing that Michele would receive some personal benefit by testifying against him. Michele admitted that she voluntarily provided information about petitioner to the Federal Bureau of Investigation in 1979 but denied that malice towards petitioner motivated her. She stated that her feeling that she was also "quite guilty of greed in this" and her desire for "everyone to know the truth" prompted her to go to the authorities. Michele also denied receiving any promises from the Internal Revenue Service in exchange for *108 her testimony against petitioner. Her testimony withstood extensive and emotional cross-examination, is consistent with other evidence, and is otherwise credible. We accept it as further evidence of petitioner's fraudulent intent. Petitioner's behavior throughout the years was obviously designed to conceal petitioner's tax liability. By not filing returns, he placed on respondent the necessity to discover his noncompliance. Although petitioner made an attempt to appear cooperative during Mr. Lindquist's investigation while he was incarcerated, when petitioner was able to meet with respondent's agents, he did not make himself available. Petitioner's failure to cooperate in the attempt to determine his correct tax liability is, in the context of this record, further indicia of fraud. Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958); Grosshandler v. Commissioner,75 T.C. 1, 20 (1980). Petitioner has not addressed the additions to tax for failure to pay estimated taxes under section 6654. Those additions are mandatory in the absence of special circumstances not here present and must be sustained. Grosshandler v. Commissioner,supra at 21. *109 Because of respondent's concessions, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. The terms "borrowed" and "loans" are used herein for convenience; no legal inference should be drawn from the use of such terms.↩
3. See, e.g., Morrell v. Commissioner,T.C. Memo. 1971-99; DePumpo v. Commissioner,T.C. Memo. 1971-115↩.