ROBERT O. HUDGENS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hudgens v. Commissioner
Docket No. 13503-83.
United States Tax Court
T.C. Memo 1985-587; 1985 Tax Ct. Memo LEXIS 49; 51 T.C.M. (CCH) 23; T.C.M. (RIA) 85587; December 2, 1985. Robert E. Lee, for the petitioner. William L. Ringuette, for the respondent. WILBUR
MEMORANDUM OPINION WILBUR, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax under section 6653(b)[1] as follows: Addition to Tax
Year
Deficiency
Sec. 6653(b)
1976
[2] $ ( 30.00)
$12,795.50
1977
(1,909.52)
11,803.24
1978
1,727.70 16,521.85
The issues for decision are (1) whether petitioner is liable for additions to tax under section 6653(b), or (2) alternatively, *51 if the Court determines that petitioner is not liable under section 6653(b) for any year in issue, whether he is liable for additions to tax for such year under sections 6651 and 6653(a). This case has been submitted fully stipulated pursuant to Rule 122(a). [3] The evidence consists of a stipulation of facts with attached exhibits which is incorporated herein by reference. The petitioner, Dr. Robert O. Hudgens, was a resident of Richmond, Virginia at the time he filed the petition in this case. During the taxable years in issue, he was engaged in the private practice of medicine in Richmond, and was also Chief of Pediatrics at Chippenham Hospital in Richmond. Petitioner failed to file timely Federal income tax returns for his 1976, 1977, and 1978 taxable years. His gross receipts, taxable income and income tax liabilities for those years were as follows: Gross
Taxable
Income tax
Year
receipts
income
liability
1976
$157,147.00
$53,742.04
$25,591.00
1977
211,129.00
61,999.85
23,606.48
1978
245,860.00
67,023.91
33,043.70
*52 He submitted returns for the years in issue, without remittance, in July of 1979. These returns showed taxable income and income tax liabilities in the following amounts: Taxable
Income tax
Year
income
liability
1976
$53,871
$25,621
1977
62,047
25,516
1978
65,117
31,316
The delinquent returns were prepared by petitioner's attorney during the course of a criminal investigation conducted by respondent. That investigation culminated in the case of United States v. Robert O. Hudgens, (Docket No. 81-0522M-01) in the United States District Court for the Eastern District of Virginia. On December 30, 1981, as part of a plea bargain agreement, a criminal information was filed by the United States Attorney charging petitioner on one count of willfully failing to file a Federal income tax return for 1978 in violation of section 7203. Petitioner pled guilty to this count, and on February 3, 1982, the district court entered a judgment of guilt and conviction. The district court's judgment has never been modified or appealed, and is now final. The delinquent returns filed during the course of the criminal investigation were subsequently audited. Although *53 they required several minor adjustments, the returns were accepted as being substantially correct, and respondent is not contending that these returns were false or fraudulent. On May 2, 1983, respondent sent petitioner a statutory notice of deficiency showing the deficiencies and additions to tax set forth above. During the years in issue, petitioner failed to file timely state as well as Federal income tax returns. He filed timely state and Federal returns for all of his taxable years prior to 1976. During the latter period, petitioner was audited twice by the Internal Revenue Service. Petitioner kept books and records adequate for the preparation of his income tax returns for each of the years in issue. A return for 1976 was prepared and sent to him by his accountant in 1977, well before the date on which it was required to be filed. Be withheld and return, but never told his accountant that he had done so. The accountant had prepared two requests for extensions of time for filing petitioner's 1976 return. Petitioner knew at the time that these requests were being made. In 1978, the accountant prepared four requests for extensions for petitioner's 1977 return, and again, *54 petitioner knew that these extensions were being sought. Shortly before the last of the extensions granted for 1977 expired, the accountant told petitioner that if he wanted a return for 1977 prepared, he would have to supply his records for that year. Petitioner gave the accountant the impression that petitioner was having his return prepared by someone else. The accountant never spoke to petitioner about his return for 1978. During 1976 and 1977, petitioner conducted his private practice in the form of a partnership; he signed and filed timely partnership returns for both years. During 1977 and 1978, he received copies of several Forms 1099 that had been mailed to the Internal Revenue Service and which reported income from various sources. In each of the years in issue, he timely filed all of his Federal employment and unemployment returns (Forms 940 and 941, respectively). He made his first estimated tax payment for 1976, but thereafter made no such payments during the years in issue. In 1974, petitioner's wife developed breast cancer and underwent a mastectomy. The operation and the disfigurement it effected put her under considerable emotional strain for the treatment *55 of which she eventually sought psychiatric help. In July of the same year, petitioner began the process of dissolving a professional partnership in which he had conducted his private practice for 2 years. It was a disagreement concerning the storage of narcotics in the office that precipitated the dissolution, but Dr. Hudgens and his partner had had many disagreements since the partnership's inception. Once the decision to dissolve the partnership had been made, petitioner's partner began to look for other office space in which to practice, but he was unable to secure a suitable office for many months. Meantime, from August 1974 through September 1975, the two former partners, now practicing separately, shared the same office space. Relations between the two doctors during these 14 months were tense; there were heated arguments between the doctors and between members of their staffs. After petitioner's partner finally left the office the partners had shared, a dispute arose concerning the proper distribution of partnership assets. In October of 1976, petitioner was sued by his former partner for breach of the partnership agreement. This action was dismissed in 1983 for failure *56 to proceed, but between October 1976 and September 1977, it was actively pursued. Petitioner had marital problems too; in 1976, he and his wife sought the help of a marriage counselor who, at the time, found it difficult to be optimistic about their case. They separated in 1979. Between March 1976 and June 1977, petitioner was treated by a psychiatrist who diagnosed a neurosis characterized by depression and anxiety. This condition caused petitioner to shrink from recognizing personal failures, including his marriage and his relationship with his former business partner. He threw himself into the compartments of his life in which he could credibly claim success--his professional life as a physician and his role as provider for his family--and disregarded the rest. On June 5, 1979, a revenue officer who had been assigned a collection matter concerning petitioner's 1976 tax return made a visit to the office out of which petitioner conducted his private practice. Petitioner was not in, and the officer left a message. Petitioner contacted the officer the next day by telephone; he told the officer that his "tax stuff" (or words to that effect) had been taken care of by an accountant, *57 and that he would contact the accountant and then get back to the revenue officer to arrange an appointment. Petitioner called the officer several days later and asked for a meeting on June 15th. On June 15, 1979, petitioner and his accountant met briefly with respondent. After having been told that he was being investigated for possible criminal violations, and having been informed of his legal rights, petitioner said he would like to talk to his attorney before answering any questions. He asked if he could use a telephone, and, when one was provided, he tried unsuccessfully to reach his attorney. Thereupon the meeting was adjourned. On June 19, 1979, petitioner and respondent met again. Petitioner was asked if he had filed Federal income tax returns for his 1976, 1977, and 1978 taxable years; he said that he had not. He was then asked why he had not; petitioner hesitated, and his attorney, who had accompanied him to the meeting, said he was not sure petitioner should go into his reasons for failing to file just then. The attorney asked if he and another of petitioner's attorneys who was also present might speak briefly to respondent after petitioner had left the meeting. *58 There was indeed a brief exchange between petitioner's attorneys and respondent after petitioner had been excused, but before he left, petitioner was asked again why he had not filed returns for the years in issue, and whether he was aware that he could file a return without paying the tax due. He declined to answer these questions. After petitioner had left the room, his attorneys told respondent that petitioner's wife had been ill, that she had suffered a mastectomy and related emotional problems; that petitioner had been in the process of dissolving the partnership in which he had conducted his private practice, and that relations between petitioner and his partner had been severely strained just prior to dissolution and during the litigation that followed; that petitioner had been under psychiatric treatment; that his marriage was in trouble; and that petitioner and his family had been living beyond their means. Petitioner and his attorneys met respondent again on October 16, 1979. During this meeting, petitioner attributed his failure to file his 1976 return to stress caused by marital problems and by legal difficulties associated with the dissolution of the partnership *59 referred to above. He also stated that money was a problem; he said there was a lot of money due and he knew he did not have it. When asked if he knew he could file a return without paying the tax due, petitioner said no, and added that one of the main things on his mind was that there was a lot of money due and he knew he did not have it. He and his family, he said, were living over their heads and he could not bring himself to make the changes necessary to lower their standard of living. Respondent remarked that the records in the files of petitioner's accountant indicated that the 1976 return had been prepared and mailed to petitioner and that all he had to do was to sign the return and send it on to the Internal Revenue Service. Petitioner responded by saying he realized that taxes were due and that he had been requesting extensions, but he was having problems and was short of funds. He added that, at that time, he was struggling to keep going, concentrating only on getting to work and caring for his patients. As to the 1977 and 1978 returns, petitioner said he had not wanted to "tackle" his 1977 and 1978 taxes without returning or paying his 1976 taxes. 1. Additions *60 to Tax for Fraud: Section 6653(b)
Under section 6653(b), if any part of an "underpayment" of tax is due to fraud, there is an addition to tax equal to 50 percent of such underpayment. The term "underpayment" is defined in section 6653(c) by reference to the definition of "deficiency" contained in section 6211. [4] Petitioner does not contest the correctness of the deficiency amounts used to compute the additions to tax in issue. His position is simply that he is not liable for those additions. We agree that petitioner is not liable for the additions to tax for fraud. The existence *61 of fraud is an issue of fact. Stratton v. Commissioner,54 T.C. 255, 284 (1970). Respondent has the burden of proving, by clear and convincing evidence, that an underpayment exists, and that some part of the underpayment for each of the years in issue was due to fraud. Section 7454(a); Rule 142(b).[5] To establish fraud, respondent must show actual, intentional wrongdoing and the specific intent to evade a tax believed to be owing. Wilson v. Commissioner,76 T.C. 623, 633 (1981); Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941); Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968). Direct evidence of the requisite intent is, of course, seldom available, but fraud may be shown by circumstantial evidence. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); Grosshandler v. Commissioner,75 T.C. 1, 19 (1980); Otsuki v. Commissioner,53 T.C. 96, 106 (1969). *62 A failure to file tax returns may constitute evidence of fraud; it may be considered in connection with other facts in determining whether the taxpayer intended to evade a tax. Grosshandler v. Commissioner,supra at 19; Beaver v. Commissioner,55 T.C. 85, 93 (1970); Stoltzfus v. United States,supra, at 1005. [6] But a failure to file, even if such failure is "willful" within the meaning of section 7203, does not in itself establish fraud. [7]Beaver v. Commissioner,supra at 93; Cirillo v. Commissioner,314 F.2d 478, 482 (3d Cir. 1963), affg. in part and revg. in part a Memorandum Opinion of this Court. *63 The precise nature of the other facts in connection with which a failure to file may give rise to an inference of fraud is apparently a matter in dispute among the Federal circuit courts. In Spies v. United States,317 U.S. 492 (1943), the Supreme Court held that a willful failure to file, of which offense the taxpayer in Spies had been convicted under section 7203's counterpart in the 1939 Code, was not enough in itself to justify a conviction for attempt to evade tax under the statutory predecessor of section 7201. [8] For the latter offense, the Court said, "Congress intended some willful commission in addition to the willful omissions that make up the list of misdemeanors." [9]Spies v. United States,supra at 499. [10]
*64 Spies is followed in civil fraud cases involving failure to file returns in the Fifth, Eighth, and Tenth Circuits. Jones v. Commissioner,259 F.2d 300 (5th Cir. 1958); First Trust & Savings Bank v. United States,206 F.2d 97 (8th Cir. 1953); Zell v. Commissioner,763 F.2d 1139 (10th Cir. 1985), affg. a Memorandum Opinion of this Court. For a finding of fraud, these circuits require a showing of some affirmative act, a willful commission (as opposed to a willful omission) the likely effect of which would be to mislead or to conceal.[11] E.g., Zell v. Commissioner,supra, at 1145. [12] The Third Circuit, however, has refused to apply the Spies test in civil fraud cases. Stoltzfus v. United States,398 F.2d 1002 (3d Cir. 1968). And the Ninth Circuit has expressly reserved judgment. Powell v. Granquist,252 F.2d 56, 59 (9th Cir. 1958). [13]
*65 The Stoltzfus case involved a taxpayer who had failed to file income tax returns for 16 years. The evidence clearly indicated that these omissions were willful, but apart from this egregious history of willful failures to file there was nothing in the findings of fact from which an intent to evade tax might be inferred; the taxpayer was not found to have committed any act fairly within the contemplation of the Spies opinion. Stoltzfus v. United States,264 F. Supp. 824, 826-827 (E.D. Pa. 1967), affd. 398 F.2d 1002 (3d Cir. 1968). He argued that since he had committed no affirmative act of deception or concealment, he could not be liable for the civil fraud addition, citing the Eighth Circuit's decision in the First Trust & Savings Bank case. The Third Circuit rejected the Eighth Circuit's conclusion that the rationale of the Spies decision extends to civil fraud cases. The court said that in order for the Government to carry its burden of proof, it must produce "'some convincing affirmative indication of the required specific intent.'" Stoltzfus v. United States,398 F.2d at 1005, quoting from Cirillo v. Commissioner,314 F.2d 478, 482 (3d Cir. 1963). *66 In the case before it, the court said, "[t]he 'convincing affirmative indication' is found in the government's showing that the taxpayer had no contemporaneous reasonable basis for believing that taxes were not owed." Stoltzfus v. United States,supra at 1005. The court then turned to the taxpayer's account of his failure to file, asking "whether it so diluted the government's case that the matter was no longer proper for decision on a factual basis." 398 F.2d at 1005. The court held that the taxpayer's plea of fear of criminal prosecution in no way diminished the Government's case; it was, the court said "in itself an admission that he did not file in order to conceal his prior years defalcations." 398 F.2d at 1005. We see no need for an extended discussion of the differences in the "affirmative action" and the "affirmative indication" tests. In the case before us respondent has failed to meet his burden under either test. The only evidence offered by respondent of any willful commission tending to mislead or conceal is that when petitioner was first contacted by respondent, in connection with the earliest of the taxable years *67 in issue, he told a revenue officer that his "tax stuff" had been taken care of by his accountant. Respondent would have us construe this statement as an attempt by petitioner to conceal the fact that he had failed to file income tax returns, on the theory, presumably, that petitioner meant to convey that as far as he knew his return for the taxable year in question had been timely filed by his accountant. The relevant facts as we have found them are these: On June 5, 1979, a revenue officer who had been assigned a collection matter concerning petitioner's 1976 tax return made a visit to the office out of which petitioner conducted his private practice. Petitioner was not in, and the officer left a message. Petitioner contacted the officer the next day by telephone; he told the officer that his "tax stuff" (or words to that effect) had been taken care of by an accountant, and that he would contact the accountant and then get back to the revenue officer to arrange an appointment. Petitioner called the officer several days later and asked for a meeting on June 15. That meeting did take place, and petitioner was accompanied by his accountant. The accountant had prepared a return *68 (though petitioner had not filed it) for petitioner's 1976 taxable year. The remark in question is equivocal; it is, no doubt, fairly susceptible of the construction recommended by respondent. But taken in context, it is susceptible of another, we believe more plausible interpretation. We believe petitioner referred to his "tax stuff" and his accountant simply by way of an explanation for his wish to consult his accountant before making an appointment with respondent. It is understandable, without assuming any intent on petitioner's part to conceal or mislead, that he should wish to have the accountant who prepared his 1976 return accompany him to a meeting with respondent concerning his tax liability for that year. We think petitioner probably meant to convey only that he preferred to put off making an appointment to meet respondent until he could find out when it might be convenient for the accountant to attend such a meeting. Apart from this remark about his "tax stuff," the record indicates that petitioner's cooperation with respondent during the latter's investigation was reasonably complete. We do not think that the remark in question precludes us from so finding. *69 The other particular facts that respondent adduces in support of a finding of fraud (excluding those which indicate merely that petitioner's failure to file was willful) are that petitioner knew he had substantial amounts of taxable income and tax liability in each of the years for which he failed to file, and that he failed to file for 3 years, a period respondent describes as "extensive." Neither of these facts points to any willful commission of the sort required under the "affirmative action" approach, but under the "affirmative indication" approach of the Third Circuit facts such as these may allow an inference of fraud. We noted above that in Stoltzfus v. United States,398 F.2d 1002 (3d Cir. 1968) it was the taxpayer's contemporaneous knowledge that he actually owed tax in each of the years he failed to file which, in conjunction with the fact of such failure, provided the basis for a finding of fraud. We have noted that the period of non-filing involved in the Stoltzfus case was 16 years, a period substantially longer than the 3-year non-filing period in the instant case. A failure to file returns for 3 years is certainly probative of fraud, but, *70 an inference of fraud from a failure to file for only 3 years is weaker than one drawn from a failure to file for 16 years. It is important to bear in mind, as we turn to examine petitioner's own account of his failure to file, that although the application of the Stoltzfus principles in this case does yield an inference that petitioner's failure to file was due to fraud, the inference drawn from such failure is made stronger and more compelling by virtue of the sheer length of the non-filing period. Petitioner explains his failure to file as follows. He was having personal problems during the years in issue. His emotional response to these problems involved his overextending himself financially, and an inability to confront his situation in any constructive way. When his accountant sent him a prepared income tax return for 1976 which showed more tax owing than he had money available to pay, he set it aside believing that he could not file a return without paying the tax shown thereon. In each of the 2 succeeding years, finding himself subject to the same financial pressures and in no better position to satisfy his tax liabilities, he failed to file again. Under strain *71 caused by the acrimonious dissolution of his business partnership and the crumbling of his marriage, he failed to take any steps to confront this continuing default on his tax obligations; he neither informed respondent nor confided to his accountant that he had not been filing returns. Respondent attacks petitioner's explanation on two grounds: first, that it is disingenuous, and second, that it is insufficient, as a matter of law, to diminish the inference of fraud that follows from the evidence in this case. According to respondent, when petitioner was first given an opportunity to explain his failure to file he declined to do so. This suggests to respondent that the explanation offered later may have been contrived. The relevant facts as we have found them are these: During a meeting with respondent on June 19, 1979, petitioner was asked, for the first time, if he had filed Federal income tax returns for the taxable years in issue. He said that he had not. He was then asked why he had not; petitioner hesitated, and his attorney, who had accompanied him to the meeting, said he was not sure petitioner should go into his reasons for failing to file just then. The attorney *72 asked if he and another of petitioner's attorneys who was also present might speak briefly to respondent after petitioner had left the meeting. There was indeed a brief exchange between petitioner's attorneys and respondent after petitioner had been excused, but before he left, petitioner was asked again why he had not filed returns for the years in issue, and whether he was aware that he could file a return without paying the tax due. He declined to answer these questions. After petitioner had left the room, his attorneys told respondent that petitioner's wife had been ill, that she had suffered a mastectomy and related emotional problems; that petitioner had been in the process of dissolving the partnership in which he had conducted his private practice, and that relations between he and his partner had been severely strained just prior to dissolution and during the litigation that followed; that petitioner had been under psychiatric treatment; that his marriage was in trouble; and that petitioner and his family had been living beyond their means. This evidence suggests to us that in preparing for the June 19 meeting, petitioner and his attorneys had agreed that, if possible, *73 the attorneys would offer petitioner's explanation for his failure to file when he was not pressent--a plan probably designed to spare petitioner the discomfort, at least initially, of having to recount his personal problems to complete strangers. We do not think that petitioner declined to explain his failure to file; he simply allowed his attorneys to articulate the explanation for him as planned. The record does not indicate whether petitioner's attorneys suggested to respondent at the June 19 meeting that petitioner did not know that he could file a return without paying the tax shown thereon. Respondent has offered no evidence to contradict petitioner's claim to that effect; he impugns this particular claim only with his general argument based on petitioner's putative refusal to offer an explanation when first asked why he had not filed returns for the years in issue. Having rejected the premise of this argument, we cannot agree with respondent that the evidence indicates that petitioner's explanation is disingenuous. As to the efficacy of that explanation, respondent notes that it has not been argued, nor does the evidence suggest, that the mental strain caused by petitioner's *74 personal problems actually affected his ability to file tax returns. Respondent also points out that petitioner's claims that he and his family were living beyond their means, and that he could not bring himself to make the changes necessary to lower their standard of living do not negate an intent to evade tax. Respondent's points are well taken, but we believe from the record as a whole that the elements of civil fraud have not been demonstrated by clear and convincing evidence. Petitioner's belief that he could not file a return without paying the tax shown thereon is of some relevance, but there are other significant factors involved. Petitioner and his family were under severe strain. The strain caused by petitioner's personal problems, manifested in his attempts to ignore his problems in general, contributed to petitioner's inability to curtail his family's expenses and focus currently on the specific problem at hand. It is true that petitioner's explanation for his failure to file does not eradicate every suspicion of fraud fairly raised by the evidence in the case, but it is not enough for respondent to show facts that raise only a suspicion of fraud. Jones v. Commissioner,259 F.2d 300, 303 (5th Cir. 1958); *75 Green v. Commissioner,66 T.C. 538, 550 (1976). The explanation offered does take account of the primary facts from which respondent would have us infer fraud, viz, that petitioner failed to file returns for 3 years, and that he did so knowing that he owed tax for each of those years. We think that petitioner's explanation disarms these facts at least to the point at which we must say that respondent has failed to carry his burden of proof on the issue of fraud. Therefore, we hold that petitioner is not liable for the additions to tax determined by respondent under section 6653(b). 2. Additions to Tax for Delinquency and Negligence: Sections 6651 and 6653(a).
Respondent argues in the alternative that petitioner is liable for additions to tax under sections 6651 and 6653(a) as follows: Additions to Tax
Year
Sec. 6651
Sec. 6653(a)
1976
$6,397.75
$1,279.55
1977
5,901.62
1,180.33
1978
8,260.93
1,652.19
Having raised these matters for the first time in his answer, respondent bears the burden of proof on the issues involved. Rule 142(a). In this instance, we believe respondent has carried his burden. [14]
*76 Section 6651(a)(1) imposes an addition to tax for failure to file timely returns, including income tax returns, unless such failure is due to reasonable cause and not to willful neglect. [15] As noted above, petitioner has been convicted, under section 7203, of willfully failing to file an income tax return for his 1978 taxable year. As to 1978, then, we are bound, by the doctrine of collateral estoppel, to find that petitioner's failure to file was willful. Gemma v. Commissioner,46 T.C. 821, 834 (1966). It is clear from the record, including petitioner's own admissions, that his failures to file for 1976 and 1977 were no less willful than his failure to file for 1978. Therefore, we hold that petitioner is liable for the additions to tax determined by respondent under section 6651. *77 Under section 6653(a), if any part of an "underpayment" [16] of tax is due to negligence or intentional disregard of rules and regulations, there is an addition to tax equal to 5 percent of such underpayment. Petitioner has admitted that he knew he had an obligation to file for each of the years in issue, and that his failure to file for each of those years was intentional. Therefore, we hold that petitioner is liable for the additions to tax determined by respondent under section 6653(a) as well as section 6651. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all references to authority designated by section number are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue. ↩
2. The negative figures in this column are the result of errors contained in delinquent Federal income tax returns filed by petitioner. These errors caused petitioner to overstate his tax liability for two of the years in issue. See infra↩ note 4.
3. Unless otherwise indicated, all references to authority designated by rule number are to the Tax Court Rules of Practice and Procedure.↩
4. For purposes of the definition of "underpayment," sec. 6653(c)(1)↩ effects one modification of the sec. 6211 definition of "deficiency," viz, that an "underpayment" unlike a "deficiency," is not reduced by the amount of tax shown on a delinquent return. This distinction explains why respondent's notice of deficiency shows both negative deficiencies and positive additions to tax for 2 of the taxable years in issue.
5. The fact that this case has been submitted pursuant to Rule 122(a) does not alter respondent's burden of proof. Rule 122(b).↩
6. Cf. Cirillo v. Commissioner,T.C. Memo. 1961-192, revd. in part on another issue 314 F.2d 478↩ (3d Cir. 1963). 7. Sec. 7203 provides, inter alia, that a taxpayer who willfully fails to file a required return is guilty of a misdemeanor. "Willfulness," for purposes of sec. 7203, means "a voluntary, intentional violation of a known legal duty." United States v. Pomponio,429 U.S. 10, 12↩ (1976).
8. Sec. 7201 provides that a taxpayer who willfully attempts to evade a tax is guilty of a felony. ↩
9. The willful omissions referred to are those now punishable under sec. 7203. Spies v. United States,317 U.S. 492, 497↩ (1943). 10. By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. * * * [Spies v. United States,supra↩ at 499.]
11. See generally, M. Saltzman, IRS Practice and Procedure. par. 7.08[2], p. 7-57 (1981). ↩
12. In the Zell case, the "affirmative act" adduced in support of the court's finding of fraud was a filing of false W-4 Forms. Zell v. Commissioner,763 F.2d 1139, 1146↩ (10th Cir. 1985), affg. a Memorandum Opinion of this Court. 13. In the Powell case, the Ninth Circuit distinguished First Trust & Savings Bank v. United States,206 F.2d 97 (8th Cir. 1953), in which the Eighth Circuit found no fraud, "[a]ssuming without deciding that what was there said regarding the criminal penalties * * * as interpreted by the Supreme Court in Spies v. United States * * * was a proper analogy to be applied to the civil penalties * * *." Powell v. Granquist,252 F.2d 56, 59 (9th Cir. 1958). The taxpayer in Powell was found to have affirmatively concealed assets during the Internal Revenue Service investigation that was prompted by the discovery of his failure to file returns. Powell v. Granquist,supra↩ at 59.
14. Petitioner has not argued in his briefs that he is not liable for the additions to tax determined by respondent under secs. 6651 and 6653(a)↩.
15. The addition to tax equals 5 percent of the amount of tax required to be shown for each month the return is delinquent, up to 5 months or 25 percent. Sec. 6651(a)(1). Sec. 6651(b) provides that, for purposes of sec. 6651(a)(1)↩, the amount of tax required to be shown on the return is reduced by any amount of tax paid on or before the date it is due plus the amount of any credit against the tax to which the taxpayer is entitled.
16. The scope of sec. 6653(a) is narrower than that of sec. 6653(b), in that it applies to "underpayments" of fewer taxes. When an income tax return is in issue, however, the definition of "underpayment" is the same for purposes of both sections. Secs. 6653(a)(1), 6653(b)(1), and 6653(c)(1)↩.